**No. 24-704**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

DEFENSE FOR CHILDREN INTERNATIONAL-PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; DR. OMAR EL-NAJJAR; AND AYMAN NIJIM,

*Plaintiffs-Appellants*,

v.

JOSEPH BIDEN, JR., President of the United States, ANTONY J. BLINKEN, Secretary of State, LLOYD JAMES AUSTIN III, Secretary of Defense,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the Northern District of California No. 23-Cv-05829

———————————

**BRIEF OF *AMICI CURIAE* SCHOLARS OF CONSTITUTIONAL LAW, FEDERAL COURTS, AND INTERNATIONAL LAW IN SUPPORT OF APPELLANTS AND REVERSAL**

———————————

JULES LOBEL
3900 Forbes Ave
Pittsburgh, Pa 15260
(412) 648-1375

JENNIFER B. CONDON
CENTER FOR SOCIAL JUSTICE
*Counsel of Record*
SETON HALL LAW SCHOOL
833 MCCARTER HIGHWAY
NEWARK, NJ 07102
(973) 642-8700
Jenny-Brooke.Condon@shu.edu

AMICI CURIAE SCHOLARS OF CONSTITUTIONAL LAW, FEDERAL COURTS, AND INTERNATIONAL LAW[*]

**MARTIN S. FLAHERTY**
LEITNER FAMILY PROFESSOR OF INTERNATIONAL HUMAN RIGHTS LAW
FORDHAM LAW SCHOOL
VISITING PROFESSOR, SCHOOL OF PUBLIC AND INTERNATIONAL AFFAIRS
PRINCETON UNIVERSITY
VISITING PROFESSOR, COLUMBIA LAW SCHOOL

**ERIC M. FREEDMAN**
SIGGI B. WILZIG DISTINGUISHED PROFESSOR OF CONSTITUTIONAL RIGHTS
MAURICE A. DEANE SCHOOL OF LAW AT HOFSTRA UNIVERSITY

**MICHAEL J. GLENNON**
PROFESSOR OF CONSTITUTIONAL AND INTERNATIONAL LAW
TUFTS UNIVERSITY FLETCHER SCHOOL OF LAW AND DIPLOMACY

**JONATHAN HAFETZ**
PROFESSOR OF LAW
SETON HALL UNIVERSITY SCHOOL OF LAW

**HELEN HERSHKOFF**
HERBERT M. AND SVETLANA WACHTELL
PROFESSOR OF CONSTITUTIONAL LAW AND CIVIL LIBERTIES
CO-DIRECTOR, ARTHUR GARFIELD HAYS CIVIL LIBERTIES PROGRAM
NEW YORK UNIVERSITY SCHOOL OF LAW

**JULES LOBEL**
BESSIE MCKEE WALTHOUR PROFESSOR OF LAW
UNIVERSITY OF PITTSBURGH LAW SCHOOL

**MARY ELLEN O'CONNELL**
ROBERT AND MARION SHORT PROFESSOR OF LAW AND
PROFESSOR OF INTERNATIONAL PEACE STUDIES-KROC INSTITUTE
UNIVERSITY OF NOTRE DAME

---

[*] The academic affiliations of *amici curiae* are listed for identification purposes only.

i

**MICHAEL J. PERRY**
ROBERT W. WOODRUFF PROFESSOR OF LAW EMERITUS
EMORY UNIVERSITY
SCHOOL OF LAW

**JOHN B. QUIGLEY**
PRESIDENT'S CLUB PROFESSOR OF LAW EMERITUS
OHIO STATE UNIVERSITY
MORITZ COLLEGE OF LAW

**KERMIT ROOSEVELT**
DAVID BERGER PROFESSOR OF THE ADMINISTRATION OF JUSTICE
UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL

**BETH STEPHENS**
DISTINGUISHED PROFESSOR OF LAW
RUTGERS LAW SCHOOL

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES

INTEREST OF *AMICI CURIAE*………………………………………………1

INTRODUCTION AND SUMMARY OF THE ARGUMENT……………………1

ARGUMENT……………………………………………………………………….4

I.  THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY WHERE THE EXECUTIVE ALLEGEDLY VIOLATES A CLEAR LEGAL DUTY…………………………………………………………...4

II.  THERE IS NO TEXTUAL COMMITMENT TO THE POLITICAL BRANCHES OF AUTHORITY TO DETERMINE WHETHER THE PRESIDENT CAN VIOLATE FUNDAMENTAL INTERNATIONAL LAW NORMS……………………………………………………..12

   A. The Framers and Early Courts Recognized that the President Lacks Authority Under the Constitution to Violate Norms of Customary International Law. …………………………………………………...13

   B. The Contemporary Court Has Continued to Reject Presidential Claims that Legal Challenges to Executive Action in the Foreign Affairs Context ARE Non-Justiciable Political Questions. …………………………………………………………………21

III.  THE QUESTIONS PRESENTED IN THIS CASE ARE JUDICIALLY MANAGEABLE BECAUSE THEY INVOLVE THE APPLICATION OF FUNDAMENTAL NORMS OF INTERNATIONAL LAW, A U.S.-RATIFIED TREATY, AND STANDARDS IN A CONGRESSIONAL STATUTE……………………………….......................................23

IV.  EVEN IF THIS COURT WERE TO HOLD THAT INJUNCTIVE RELIEF IS INAPPROPRIATE, THE REQUEST FOR A DECLARATORY JUDGMENT IS PLAINLY JUSTICIABLE……….25

CONCLUSION………………………………………………………………... 28

# TABLE OF AUTHORITIES

*Cases*

*Alperin v. Vatican Bank,*
410 F.3d 532 (9th Cir. 2005)…………………………………………………………7

*Al Shimari v. CACI,*
840 F.3d. 147 (4th Cir. 2016) …………………………………………...7, 9, 23, 24

*Al-Tamimi v. Adelson,*
916 F.3d 1 (D.C. Cir. 2019) ……………………………………………….3, 8, 25

*Baker v. Carr*,
369 U.S. 186 (1962) …………………………………………………….....passim

*Boumediene v. Bush*,
553 U.S. 723 (2008) ……………………………………………………… 21, 22

*Brown v. United States*,
12 U.S. (8 Cranch) 110 (1814)………………………………………………16

*Campbell v. Clinton*,
203 F.3d 19 (D.C. Cir. 2000) (Tatel, J., concurring)………………………………8

*Ctr. for Biological Diversity v. Mattis*,
868 F.3d 803 (9th Cir. 2017)…………………………………………………passim

*Cohens v. Virginia*,
6 Wheat, 264 (1821)…………………………………………………………...2

*Comm. of U.S. Citizens Living in Nicaragua v. Reagan,*
859 F.2d 929 (D.C. Cir. 1988)…………………………………………………8, 9

*Corrie v. Caterpiller Corp.*,
503 F.3d 974 (9th Cir. 2007)…………………………………………………11

*Dames & Moore v. Regan*,
453 U.S. 654 (1981)…………………………………………………………20

*Deutsch v. Turner Corp.*,
324 F.3d 694 (9th Cir. 2003)…………………………………………………………10

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d. 836 (D.C. Cir. 2010) (en banc)……………………………………7, 8, 11

*Filártiga v. Peña–Irala*,
630 F.2d 876 (2d Cir. 1980)…………………………………………………………25

*Glass v. The Sloop Betsey*,
3 U.S. (3 Dall.) 6 (1794)…………………………………………………………...18

*Haig v. Agee*,
453 U.S. 280 (1981)………………………………………………………………...1

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004)……………………………………………………......... 21

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986)…………………………………………………..passim

*Jones v. United States*,
137 U.S. 202 (1890)…………………………………………………………………22

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995)………………………………………………………...25

*Koohi v. United States*,
976 F.2d 1328 (9th Cir. 1992)……………………………………………… 3, 4, 27

*Little v. Barreme*,
6 U.S. (2 Cranch) 170 (1804)……………………………………………………...17

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803)…………………………………………4, 5, 13, 27

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022)……………………………………………………26

*Murray v. The Schooner Charming Betsey*,
6 U.S. (2 Cranch) 64 (1804)……………………………………………………18, 19

*The Nereide*,
13 U.S. 388 (1815)………………………………………………………….. 19

*Paquete Habana*,
175 U.S. 677 (1900)………………………………………………………20

*The Prize Cases*,
67 U.S. (2 Black) 635 (1863)……………………………………………20

*Ramirez de Arellano v. Weinberger*,
745 F.2d 1500 (D.C. Cir. 1984) (en banc)…………………………………9

*Regan v. Wald,*
468 U.S. 222 (1984)……………………………………………...............20

*Rep. of Marsh Islands v. United States*,
865 F.3d 1187 (9th Cir 2017)………………………………………...11

*Salim v. Mitchell*,
183 F.Supp.3d 1121 (E.D. Wash. 2016)…………………………………...24

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019)……………………………………...11, 26

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)……………………………………………...12, 24

*Tel–Oren v. Libyan Arab Republic*,
726 F.2d 774  (D.C. Cir. 1984)…………………………………………9

*United States ex rel. Joseph v. Cannon*,
642 F.2d 1373 (D.C. Cir. 1981)…………………………………………6

*Vermilya-Brown Co. v. Connell*,
335 U.S. 377 (1948)……………………………………………………22

*Williams v. Suffolk Ins. Co.*,
38 U.S. 415 (1839)………………………………………………………...22

*Youngstown Sheet and Tube v. Sawyer*,
343 U.S. 579 (1952)………………………………………………...20, 21

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)………………………………………………..passim

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 701 et seq. ……………………………10

National Historic Preservation Act (NHPA), 54 U.S.C. § 307101(e)……………...10

28 U.S.C. § 1350…………………………………………………………...13

18 U.S.C. § 1091……………………………………………………… 24

18 U.S.C. § 1093……………………………………………………… 24

**Other Authorities**

Sarah H. Cleveland,
*Our International Constitution*, 31 YALE J. INT'L L. 1 (2006)……………………..20

MARTIN FLAHERTY,
RESTORING THE GLOBAL JUDICIARY (2019)……………………………15, 17, 18, 19

15 Alexander Hamilton, *Pacificus No. 1*,
in The Papers of Alexander Hamilton 33 (Harold C. Syrett ed., 1961)……….13, 14

David M Golove & Daniel J Hulsebosch,
*A Civilized Nation: The Early American Constitution, The Law of Nations, and the Pursuit of International Recognition,* 85 N.Y.U. L. Rev. 932 (2010)…………15, 18

James Madison,
*Helvidius No. II*, reprinted in 2 WRITINGS OF JAMES MADISON 151  (Gaillard Hunt ed., 1906)…………………………………………………………………14

*Letter from Chief Justice Jay and Associate Justices to President Washington (Aug. 8, 1793)* in 3 The Correspondence and Public Papers of John Jay 488-489 (Henry P. Johnston ed., 1891)…………………………………………….........................17

*Letter from James Madison to Thomas Jefferson*, Apr. 2, 1798, reprinted in 2 WRITINGS OF JAMES MADISON 151 (GAILLARD HUNT ED., 1906)…………………14

1 Op. Atty. Gen. 566 (1822)…………………………………………………………15

11 Op. Atty. Gen. 297 (1865) …………………………………………………..15

David Sloss, *Judicial Foreign Policy: Lessons from the 1790s*, 33 ST. LOUIS U. L.J. 145 (2008)………………………………………………...18

David L. Sloss, Michael D. Ramsey, & William S. Dodge, *International Law in the Supreme Court to 1860*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 7, 49 (David L. Sloss, Michael D. Ramsey, and William S Dodge eds., 2011)……………………………………………………………………16

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* scholars of constitutional law, federal courts, and international law teach and write at American law schools, including about the enforcement of international law in U.S. courts. Although they take no position on the merits of the Appellants' claims and the Appellees' defenses, *amici* share the view that the district court wrongly dismissed this lawsuit as a non-justiciable political question based upon an erroneous and alarming application of that doctrine. They write to explain how affirming the district court's decision would create serious mischief and uncertainty by contradicting this Court's and the U.S. Supreme Court's political question jurisprudence and degrading the essential judicial role in interpreting and applying the law, including norms of international law, treaties, and their implementing statutes.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's political question holding rests entirely on the inapposite and non-controversial proposition that "[f]oreign policy is constitutionally committed to the political branches of government, and disputes over foreign policy are considered nonjusticiable political questions." 1-ER-8 (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981)). But that principle is not actually at issue in this case. As the

---

[1] *Amici*'s biographies are included in an Appendix.

Supreme Court has repeatedly recognized, even if foreign *policymaking* is committed to the political branches, *legal* disputes that touch on foreign affairs are not automatically policy disputes or political questions. *Japan Whaling Ass'n v. Am. Cetacean Soc'y.*, 478 U.S. 221, 229-30 (1986). The Court has rejected "sweeping statements" to the contrary, stating that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962). Even in the foreign affairs context, the political question doctrine remains a "narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky v. Clinton,* 566 U.S. 189, 194-95 (2012) ("*Zivotofsky I*") (quoting *Cohens v. Virginia*, 6 Wheat, 264, 404 (1821)).

For this reason, when faced with a motion to dismiss arguing that a case presents a political question—especially in matters of foreign affairs—the Court has made clear that first determining the *actual issue* before it is essential. *Baker*, 369 U.S. at 211 (requiring "a discriminating analysis of the *particular question* posed") (emphasis added); *Zivotofsky I*, 566 U.S. at 195-96 (distinguishing between the policy question of the President's decision to recognize foreign sovereigns and the legal question of a statute's constitutionality); *see also Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 822 (9th Cir. 2017) ("requir[ing] close attention to the

particular claims presented"). "Abstraction and generality do not suffice." *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).

Here, the district court eschewed its responsibility to closely analyze the actual issues presented in favor of abstraction, generality, and already rejected misconceptions about what is and is not a political question. It relied wholesale upon the boundless declaration that any legal challenge to a "foreign policy decision whether to provide military or financial support to a foreign nation" is a political question. 1-ER-8. This short-circuited reasoning conflicts with settled doctrine.

First, it failed to discern whether Plaintiffs' claims challenge a purely discretionary executive policy decision, or a decision made allegedly in violation of law. Second, the court failed to analyze whether the specific issue allegedly presenting a political question is textually committed to the executive branch or lacks judicially manageable standards necessary to resolve the legal dispute—the central inquiry in political question analysis. *Zivotofsky I*, 566 U.S. at 195. Finally, the court failed to consider the different forms of relief Plaintiffs seek even though "[t]he nature of the remedy sought is relevant to considering whether any of the *Baker* factors are inextricable" from the claims at issue. *Ctr. for Biological Diversity*, 868 F.3d. at 827. Suits requesting injunctive relief "'are far more likely to implicate political questions'" if they engage the judiciary "'in the type of operational decision-making beyond their competence[,]'" *id.* (quoting *Koohi v. United States*,

976 F.2d 1328, 1332 (9th Cir. 1992), *cert. denied* 508 U.S. 960 (1993)), whereas judgments declaring the Executive's legal obligations present lesser separation of powers problems.

For all these reasons, the particularized analysis required by this Court and the Supreme Court that was missing from the district court's reasoning leads inescapably to the conclusion that it was error to dismiss this case as a non-justiciable political question. As history and precedent demonstrate, interpreting and applying legal limits upon executive action, even in the foreign affairs context, is not only a familiar judicial exercise, it is an essential one, upon which the rule of law depends.

## ARGUMENT

## I. THE POLITICAL QUESTION DOCTRINE DOES NOT APPLY WHERE THE EXECUTIVE ALLEGEDLY VIOLATES A CLEAR LEGAL DUTY.

The political question doctrine's status as a limited exception to judicial review dates to Chief Justice Marshall's recognition in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) that courts have no power to interfere with political discretion but when presented with live disputes are constitutionally bound to interpret and apply the law. Chief Justice Marshall stated:

> The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which

4

are, by the constitution and laws, submitted to the executive can never be made in this court.

*Id.*

The Court in *Marbury* emphasized that only where the challenged action turned on executive discretion could a court avoid its obligation "to say what the law is." *Id.* at 170, 177. The Court concluded that nothing "shall forbid a court to listen to the claim, or to issue a mandamus, directing the performance of a duty, not depending on executive discretion, but on particular acts of congress, and the general principles of law[.]" *Id.* at 170.

This distinction between challenges to executive discretion which are in their nature political and the Court's duty "to say what the law is" pervades the Court's modern political question jurisprudence. For example, in the 1986 decision *Japan Whaling Ass'n v. Am. Cetacean Society*, the Court determined that the doctrine excludes from judicial review only "those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." 478 U.S. at 230. But the Court drew a distinction between those discretionary policy matters and the Court's authority and duty to interpret and apply the law. *Id.* ("[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."). The Court explained this precept in separation of powers terms, noting that while "'courts are fundamentally under-equipped to formulate national policies or

5

develop standards for matters not legal in nature'" interpreting the legal duties imposed upon the other branches is one of the judiciary's characteristic functions. *Id.* (quoting *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1379 (D.C. Cir. 1981), *cert. denied,* 455 U.S. 999 (1982)).

*Japan Whaling* arose in the context of foreign affairs, but that fact did not alter this basic role division. The Court reasoned that while Congress and the President have the "premier role" in conducting the nation's foreign policy, "courts have the authority to construe [statutes,] treaties and executive agreements" and "cannot shirk this responsibility merely because [the] decision may have significant political overtones." *Id.* at 230-31.

More recently, in 2012, in *Zivotofsky v. Clinton*, the Court reiterated the distinction between challenges to discretionary foreign policy determinations and those claiming that the government is violating a specific legal duty. 566 U.S. at 196. In that case, a U.S. citizen sought to enforce a congressional statute allowing Americans born in Jerusalem to list "Israel" as their birthplace on their passports. *Id.* at 192-93. In finding the case justiciable notwithstanding its foreign policy implications, the Court reasoned that "[t]he federal courts [were] not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be." *Id.* at 196. Rather, the case merely asked the Court to "enforce a specific statutory

right." *Id.* Determining whether "Zivotofsky's interpretation of the statute [was] correct and whether the statute [was] constitutional" was a "familiar judicial exercise." *Id.*

Like the U.S. Supreme Court, this Circuit has refused to dismiss as political questions claims that raised purely legal questions merely because of their political consequences. *See Ctr. for Biological Diversity*, 868 F.3d. at 822-24 (finding justiciable environmental organizations' claims against Department of Defense for allegedly failing to comply with statutory mandates before approving a military base in Japan); *Alperin v. Vatican Bank*, 410 F.3d 532, 539, 548 (9th Cir. 2005) (holding that the political question doctrine did not bar Holocaust Survivors' property claims against the Vatican Bank for alleged profiting off of the genocidal acts of a "Nazi puppet regime during World War II" in Croatia).

Other circuits have also distinguished challenges to the wisdom of policy choices and value judgments from legal issues that are the province of the courts to resolve. *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d. 836, 842 (D.C. Cir. 2010) (en banc); *Al Shimari v. CACI*, 840 F.3d 147, 158 (4th Cir. 2016). For example, the *en banc* D.C. Circuit Court of Appeals in *El-Shifa Pharmaceutical Company. v. United States*, noted that while "courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security" that limitation does not foreclose judicial

resolution of legal claims. 607 F.3d. at 842. There, the court "distinguished between claims requiring [it] to decide whether taking military action was 'wise'—'a "policy choice and value determination constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch"'—and claims 'presenting purely legal issues' such as whether the government had legal authority to act." *Id.* (quoting *Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring) (quoting *Japan Whaling*, 478 U.S. at 230))).

Applying this pivotal distinction, the D.C. Circuit later concluded that while claims against Israeli settlers questioning "who has sovereignty over disputed territory" presented a nonjusticiable political question, the separate issue of whether "Israeli settlers [were] committing genocide" was "a purely legal issue" justiciable by the courts. *Al-Tamimi*, 916 F.3d at 11. The court emphasized that in "a case involving foreign affairs" the basic rule still applies that "policy choices are to be made by the political branches and purely legal issues are to be decided by the courts." *Id.*

Indeed, even cases involving U.S. government funding abroad have not confused these two polestars. In *Committee of United States Citizens Living in Nicaragua v. Reagan*, the D.C. Circuit rejected the government's claim that a case challenging U.S. government funding of the Nicaraguan contras was a political question wholly

8

beyond judicial review. 859 F.2d 929, 932 (D.C. Cir 1988).[2] There, plaintiffs challenged the funding decision as a violation of their Fifth Amendment rights and an International Court of Justice ("ICJ") decision holding that the U.S. government violated customary international law. *Id.* Although the district court held that this was a political question, the D.C. Circuit reversed finding "the trial court's blanket invocation of the political question doctrine to be inappropriate." *Id.* at 933. Citing "the care with which the…doctrine should be applied" and noting "the variety of claims encompassed by" the case, *id.* at 933, the court found the dismissal on political question grounds "troubling." *Id.* at 934. It warned against the doctrine's "'indiscriminate and overbroad application to claims properly before the federal courts.'" *Id.* (quoting *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985)).

Similarly, the Fourth Circuit declined to dismiss on political question grounds claims alleging that U.S. military contractors tortured Iraqi civilians during a military conflict, relying on the distinction between discretionary policy matters and legal claims. *Al Shimari*, 840 F.3d. at 158 (finding that "the district court erred in

---

[2] While finding the complaint justiciable, the court dismissed it on the merits concluding that "private parties have no cause of action in this court to enforce an ICJ decision." *Id.* at 934. The court still presciently noted that the "basic norms of international law…may well have the domestic legal effect that appellants suggest… and that these include, at a minimum, bans on governmental 'torture, summary execution, genocide, and slavery.'" *Id.* at 941 (quoting *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1003 (1985)).

failing to draw a distinction between unlawful conduct and discretionary acts"). The court reasoned that plaintiffs' "allegations of unlawful conduct in violation of settled international law or criminal law then applicable to the [contractor's] employees" fell outside the political question doctrine. *Id.*

Following the Supreme Court's admonition that not every claim that concerns foreign policy presents a political question, this Court has previously distinguished between disputes inviting the judiciary to impermissibly "make policy related to foreign affairs" and cases requiring it to interpret and apply the law. *Deutsch v. Turner Corp.*, 324 F.3d 694, 713 n.11 (9th Cir. 2003) (stating no political question "is raised by the simple application of the requirements of a treaty to which the United States is a party" because "treaties have the force of law"). The political question doctrine thus did not prevent this Court from evaluating whether the decision to build a military base in Japan complied with the National Historic Preservation Act, 54 U.S.C. § 307101(e), and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. because enforcing those statutes did not require it to "pass judgment on the wisdom of the Executive's ultimate foreign policy or military decisions." *Ctr. for Biological Diversity*, 868 F.3d at 823 (quotation omitted). The Court similarly evaluated whether budgetary transfers of funds to construct a wall on the southern U.S. border complied with the Department of Defense Appropriations Act of 2019 and the Appropriations Clause of the Constitution.

10

*Sierra Club v. Trump*, 929 F.3d 670, 687 (9th Cir. 2019). Assessing that legal question did not require the Court to decide whether the projects were "worthy or whether, as a policy judgment, funds should be spent on them." *Id.* Rather, the Court was only tasked with determining "whether the reprogramming of funds" was "consistent with" law—"'a familiar judicial exercise.'" *Id.* (quoting *Zivotofsky I*, 566 U.S. at 196).

In contrast, it is *only* when an action challenges the exercise of true policy discretion—"'the prudence of the political branches in matters of foreign policy or national security'"—that this Court will find the dispute beyond judicial competence. *See Rep. of Marsh Islands v. United States*, 865 F.3d 1187, 1201 (9th Cir 2017) (quoting *El-Shifa*, 607 F.3d at 842 (en banc)). Applying this rationale, in *Corrie v. Caterpillar Corp.,* this Court concluded that a case presented a nonjusticiable political question because it centered on executive branch financing pursuant to a "program calling for executive discretion as to what lies in the foreign policy and national security interests of the United States." 503 F.3d 974, 982 (9th Cir. 2007).

Here, unlike in *Corrie*, plaintiffs do not question the wisdom or discretionary policy choice of the President's military aid to Israel. Nor do they seek "to supplant a foreign policy decision of the political branches with the [Court's] own unmoored determination of what United States policy toward Jerusalem should be." *Zivotofsky*

*I*, 566 U.S. at 196. Rather, they claim that such actions are subject to legal restraints, namely a fundamental norm of international law prohibiting aiding of genocide, which is also prohibited by a treaty ratified by the United States and a federal criminal statute implementing that treaty obligation. This is precisely the type of legal issue and fundamental international law norm that the Supreme Court has determined courts may interpret and apply in lawsuits alleging violations of modern international law. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). And it likewise involves the kind of statutory and treaty obligations that the Supreme Court has said "courts have the authority to construe" and "cannot shirk" from their responsibility to do so. *Japan Whaling*, 478 U.S. at 230.

## II.  THERE IS NO TEXTUAL COMMITMENT TO THE POLITICAL BRANCHES OF AUTHORITY TO DETERMINE WHETHER THE PRESIDENT CAN VIOLATE FUNDAMENTAL INTERNATIONAL LAW NORMS.

*Baker v. Carr*, 369 U.S. at 211, *Japan Whaling*, 478 U.S. at 229-30, and particularly *Zivotofsky I*, 566 U.S. at 196, repudiate dicta in older decisions relied upon by the district court suggesting that the conduct of foreign relations is wholly immune from judicial inquiry even when it implicates questions of law. In *Zivotofsky*, a case clearly implicating foreign relations, the Court recognized that "there is, of course, no exclusive commitment to the Executive of the power to determine the constitutionality of a statute." *Zivotofsky I*, 566 U.S. at 197. As in

*Zivotofsky*, whatever powers the President and Congress have regarding foreign aid,[3] there is no exclusive commitment to the Executive *to decide* whether the President has authority to provide military foreign aid that violates a fundamental norm of international law prohibiting genocide, a U.S-ratified treaty, and a congressional statute criminalizing genocide. Nor is there any textual commitment to the President to determine whether the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, provides a cause of action against the President and Secretary of State for aiding genocide. Resolving these kinds of legal questions are "emphatically the province and duty of the judicial department[,]" *Marbury*, 5 U.S. (1 Cranch) at 177, and historically the judiciary has decided them.

A.   **The Framers and Early Court Recognized that the President Lacks Authority Under the Constitution to Violate Norms of Customary International Law.**

From the nation's beginning, both the framers of the Constitution and the Supreme Court have consistently recognized that the President does not have constitutional discretion to violate norms of customary international law. For example, both Hamilton and Madison agreed in their famous debate on the constitutional authority for President Washington's 1793 Proclamation of Neutrality that the President was required to execute international law. 15 Alexander Hamilton, *Pacificus No. 1*, in THE PAPERS OF ALEXANDER HAMILTON, 33, 40 (Harold C. Syrett

---

[3] Unlike in *Zivotofsky*, there is no explicit text that accords such power.

13

ed., 1961). Hamilton argued that "the Executive is charged with the execution of all laws, the laws of Nations as well as the Municipal law, which recognizes and adopts those laws." *Id.* at 40. So too, Madison claimed that the Executive "is bound to the faithful execution of [the laws of neutrality] as of all other laws, internal and external, by the nature of its trust and the sanction of its oath …." James Madison, *Helvidius No. II*, reprinted in 2 WRITINGS OF JAMES MADISON 151, 159-60 (Gaillard Hunt ed., 1906).[4]

Other early leaders agreed with Madison and Hamilton.[5] Scholars have recognized that the framers believed that the President's constitutional powers to

---

[4] Five years later, Madison again argued that the Executive lacked power to act in derogation of international law. *Letter from James Madison to Thomas Jefferson*, Apr. 2, 1798, reprinted in 2 WRITINGS OF JAMES MADISON, *supra*, at 313. The Adams administration had prohibited the arming of ships in U.S. ports as a violation of neutrality. *Id.* As tensions mounted between France and the United States, but before Congress had acted, the Executive revoked its prohibition, thereby granting "an indirect license to arm." *Id.* Madison complained that the Executive had no power to grant such an indirect license:

> The first instructions were no otherwise legal than as they were in pursuance of the Law of nations, and, consequently in execution of the law of the land. The revocation of the instructions is a virtual change of the law, and consequently a usurpation by the Executive of a legislative power.

*Id.*

[5] Attorney General William Wirt in an 1822 opinion concluded that the obligation of the President as executive officer to enforce the laws of the country extended to

14

conduct foreign affairs, including warfare, was limited by international law norms. *See, e.g.*, David M. Golove & Daniel J. Hulsebosch, *A Civilized Nation: The Early American Constitution, The Law of Nations, and the Pursuit of International Recognition*, 85 N.Y.U. L. REV. 932, 1008 (2010) (summarizing the framers' intent that the "President [have] no more authority to violate the nation's international legal obligations than to disregard an act of Congress").

Moreover, the Supreme Court, from our nation's beginning, has often recognized limits on the President's foreign policy and war powers when the President acted in violation of international law, statutes, or the Constitution. MARTIN FLAHERTY, RESTORING THE GLOBAL JUDICIARY, 77-82 (2019) (recounting how the early Supreme Court showed no hesitancy in enforcing "restrictions against the Executive…regardless of whether the constraints derived from the Constitution, statutes, treaties, or the customary law of nations… [and] regardless of the Executive's assessment of the foreign affairs consequences"); David L. Sloss,

---

the "general laws of nations." 1 Op. Atty. Gen. 566, 570 (1822). Attorney General James Speed agreed, stating that the laws of war

> [l]ike the other laws of nations[,] . . . are of binding force upon the departments and citizens of the Government, though not defined by any law of Congress. . . . Under the Constitution of the United States no license can be given by any department of the Government to take human life in war, except according to the law and usages of war.

11 Op. Atty. Gen. 297, 299-301 (1865).

Michael D. Ramsey, and William S. Dodge, *International Law in the Supreme Court to 1860*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 7, 49 (David L. Sloss, Michael D. Ramsey, and William S. Dodge eds., 2011) (noting that the early "Court frequently invoked international law to constrain the exercise of governmental power").

For example, in *Brown v. United States*, the Court rejected the Executive's attempt to seize enemy property during the War of 1812 by construing the scope of the President's constitutional war powers consistently with the law of nations. 12 U.S. (8 Cranch) 110 (1814). Chief Justice Marshall reasoned that "a construction [of the Constitution] ought not lightly to be admitted which would give to a declaration of war an effect in this country it does not possess elsewhere." *Id.* at 125. Justice Story's dissent disagreed with Marshall's view of international law but agreed that the Constitution limited the President's war powers to those "which, by the modern law of nations, are permitted and approved." *Id.* at 145 (Story J., dissenting). Justice Story noted that the President "has a discretion vested in him, as to the manner and extent; but he cannot lawfully transcend the rules of warfare established among civilized nations." *Id.* at 153. The President, Justice Story reasoned, "cannot lawfully exercise powers or authorize proceedings which the civilized world repudiates and disclaims." *Id.*

Similarly, in *Little v. Barreme*, Justice Marshall writing for a unanimous Court, determined that the Secretary of the Navy's instructions to American naval captains during the 1790s undeclared war with France went beyond Congress's authorization. 6 U.S. (2 Cranch) 170 (1804). The Court deemed Captain Little's seizure of a foreign ship pursuant to those instructions unlawful and ordered the captain to pay damages for the seizure, even though he was only following the President's orders. *Id.* at 178-79. Justice Marshall, having written in *Marbury* just one year before that political matters delegated to the political branches were not appropriate for judicial review, adjudicated the lawfulness of the President's wartime instructions to military captains. *See id.*

The 1790s Neutrality Crisis also occasioned numerous Supreme Court decisions involving delicate matters of U.S. foreign policy with respect to the new Republic's duties and obligations under the law of nations. In a well-known episode, the Washington Administration requested during a war between England and France that the Supreme Court answer a long list of legal questions from the Cabinet about the rights and duties of a neutral nation under international law. *See* Flaherty, *supra* at 71. The Court did not refuse to answer because the questions were political questions inappropriate for judicial review, but rather because the request sought an advisory opinion. *Letter from Chief Justice Jay and Associate Justices to President Washington* (Aug. 8, 1793) in 3 THE CORRESPONDENCE AND PUBLIC PAPERS OF JOHN

17

JAY 488-489 (Henry P. Johnston ed., 1891); *see also Flaherty*, *supra* at 72 (emphasizing that neither the Cabinet nor the Court believed these were political questions inappropriate for judicial review).

Indeed, when presented with a live controversy less than a year later, the Court, in the landmark decision, *Glass v. The Sloop Betsey*, 3 U.S. (3 Dall.) 6 (1794), resolved one of the central questions regarding the law of nations posed in the Administration's prior letter. Golove & Hulsebosch, 85 N.Y.U. L. Rev. at 1025-27 (noting the Court extended the federal courts' prize jurisdiction—the power to determine the distribution of property captured at sea in wartime—to rule on the legality of French captures brought into American ports). Following that decision, the Court continued to decide international law questions involving neutrality that were critical to U.S. national security. *See* David Sloss, *Judicial Foreign Policy: Lessons from the 1790s*, 33 ST. LOUIS U. L.J. 145, 146-48 (2008) (noting that between February 1794 and February 1797 "roughly half of the Supreme Court caseload" addressed legal issues intersecting with the "most important national security issue of the era: how best to maintain U.S. neutrality in the ongoing war").

During this early period, the Court continued to interpret and apply the law of nations. For example, in *Murray v. The Schooner Charming Betsey*, 6 U.S. (2 Cranch) 64, 118 (1804), the Court ruled unlawful under the law of nations an American captain's seizure of a ship he believed to be a French vessel, holding that

18

there was a presumption that Congress did not intend to derogate from international law in enacting statutes. Chief Justice Marshall famously declared that a federal statute "ought never to be construed to violate the law of nations if any other possible construction remains." *Id.*

Then, in *The Nereide,* 13 U.S. 388, 422 (1815), the Court held that the judiciary is bound to apply the law of nations to Executive conduct absent explicit Congressional derogation. Specifically, Chief Justice Marshall noted that the political branches had discretion to take retaliatory or reciprocal actions against neutral foreigners, and deciding whether to impose such discretionary actions was outside the Court's competence. *Id.* However, as Marshall put it, until such a congressional "act be passed, the Court is bound by the law of nations which is a part of the law of the land." *Id.* at 423. Thus, the Charming Betsy Canon and the *Nereide* decision make clear that at least absent a clear Congressional statute to the contrary, the Court was "bound" to apply the law of nations as the law of the land to Executive actions allegedly in derogation of that law.

Throughout the last two centuries, the Supreme Court has continued to decide legal disputes involving foreign policy and war powers cases where a party claimed the Executive branch violated the Constitution, federal statutes, or international law. Flaherty, *supra* at 82, 87-90. And the Court has continued to utilize international law in deciding the legal disputes at issue. *Id.*

In *the Prize Cases*, the Court looked to international law in affirming President Lincoln's Civil War blockade. 67 U.S. (2 Black) 635 (1863). As a leading international law scholar, now a Judge on the International Court of Justice nominated by the U.S. government, wrote, "[a]ll members of the Court agreed [in the Prize cases] that, once a legal state of war was established, the scope of presidential power to wage war was governed by the international laws of war." Sarah H. Cleveland, *Our International Constitution*, 31 YALE J. INT'L L. 1, 20 (2006).

In the *Paquete Habana*, 175 U.S. 677, 700 (1900), the Supreme Court ruled that the American military did not have the authority to seize a Cuban fishing vessel during the Spanish American War because the seizure violated international law. The Court famously stated that "international law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their administration." *Id.*

Throughout the latter part of the 20th century the Court continually adjudicated claims that U.S. foreign policy actions violated separation of powers or individual rights. *See Youngstown Sheet and Tube v. Sawyer*, 343 U.S. 579 (1952); *Regan v. Wald*, 468 U.S. 222 (1984); *Dames & Moore v. Regan*, 453 U.S. 654 (1981). Not

20

once did the Court hold that a challenge to U.S. foreign policy as allegedly violating legal strictures or individual rights raised a non-justiciable political question.

**B.    The Contemporary Court Has Continued to Reject Presidential Claims that Legal Challenges to Executive Action in the Foreign Affairs Context Are Non-Justiciable Political Questions.**

In more recent periods, the Court has continued to reject Presidential arguments that legal challenges to executive action raise non-justiciable political questions, or entitle the President to virtually absolute deference, simply because they arise in the foreign affairs context. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Boumediene v. Bush*, 553 U.S. 723 (2008). Indeed, despite these arguments, the Court adjudicated claims in cases arising out of the nation's armed conflict against suspected "enemy combatants." *See id.* As Justice O'Connor wrote, ever since *Youngstown Steel*, the Supreme Court has "long since made clear that a state of war is not a blank check for the President." *Hamdi*, 542 U.S. at 536 (plurality opinion) (citing *Youngstown*, 343 U.S. at 587).

*Boumediene v. Bush* is particularly instructive here, because, as in *Zivotofsky*, the Court undertook a discriminating analysis of the precise issue involved to reject the Executive's political question argument. 553 U.S. at 755. The President argued that federal courts could not exercise habeas jurisdiction because "Guantanamo was not within [the United States'] sovereign control." *Id.* at 753. The Court accepted that who "maintains sovereignty, in a legal and technical sense of the term, over

21

Guantanamo Bay" was for the President and not the Court to determine, *id.* at 754, and that this issue would ordinarily present a political question. *Id.* at 753 (noting that "in other contexts the Court has held that questions of sovereignty are for the political branches to decide") (citing *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948) ("[D]etermination of sovereignty over an area is for the legislative and executive departments"); *Jones v. United States*, 137 U.S. 202 (1890); *Williams v. Suffolk Ins. Co.*, 38 U.S. 415 (1839)). But the *Boumediene* Court rejected the Government's political question argument because the particular issue involved was not whether Guantanamo was subject to the de jure sovereignty of the United States. Rather, the issue was whether habeas corpus relief was available, requiring the Court to analyze "the objective degree of control the Nation asserts over foreign territory." *Id.* at 754 ("When we have stated that sovereignty is a political question, we have referred not to sovereignty in the general, colloquial sense, meaning the exercise of dominion or power…but sovereignty in the narrow, legal sense of the term, meaning a claim of right[.]") (internal citations omitted). The Court concluded that dismissing the petitions on political question grounds would require accepting the unfounded "premise that de jure sovereignty is the touchstone of habeas corpus jurisdiction" which would "be inconsistent with our precedents and contrary to fundamental separation-of-powers principles." *Id.* at 755.

22

So too, in this case the issue is not whether providing military funding to another nation is a decision for the political branches generally to make. Rather, the issue is whether the Executive has a duty under a fundamental norm of international law prohibiting genocide, a congressional statute criminalizing genocide, and a treaty ratified by the United States, to refrain from providing military aid to another nation which aids in the commission of genocide. That specific issue presents a legal question, not a political question, under the framework and precedent of the Court.

III. **THE QUESTIONS PRESENTED IN THIS CASE ARE JUDICIALLY MANAGEABLE BECAUSE THEY INVOLVE LEGAL STANDARDS DERIVED FROM FUNDAMENTAL NORMS OF INTERNATIONAL LAW, A U.S.-RATIFIED TREATY, AND A CONGRESSIONAL STATUTE.**

Resolving whether fundamental norms of international law incorporated into a U.S.-ratified treaty and criminal statute are binding on the President does not "'turn on standards that defy judicial application.'" *Zivotofsky I*, 566 U.S. at 201 (quoting *Baker*, 369 U.S. at 211). Rather, addressing that issue simply requires application of "familiar principles of constitutional interpretation." *Id.* Whether the Alien Tort Statute authorizes federal jurisdiction over a cause of action to redress the Executive's alleged violation of a legal duty to prevent genocide likewise involves a matter of legal interpretation for which judicially manageable standards readily apply. *See Al Shimari*, 840 F.3d. at 161 ("interpret[ing] statutory terms and established international norms to resolve" torture claims under the ATS).

23

The Supreme Court made clear in *Sosa v. Alvarez-Machain*, that the norms of international law actionable under the ATS are limited to those "of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms recognized" by the Court. 542 U.S. at 725. The prohibition on genocide is one of those norms, and it is defined with a specificity that makes it clearly judicially manageable. *See* 18 U.S.C. §§ 1091, 1093 (defining the offense). Indeed, all three norms that *Sosa* cited as judicially cognizable in the 18th century have been incorporated by Congress into U.S. criminal law, just as the prohibition on genocide is today. *See* 18 U.S.C. §§ 1091, 1093.

Not surprisingly, courts have consistently rejected the proposition that they lack judicially manageable standards to address offenses set forth in federal criminal statutes. *See Al Shimari*, 840 F.3d at 161 (finding judicially manageable standards after noting that "the terms 'torture' and 'war crimes' are defined at length in the United States Code and in international agreements to which the United States government has obligated itself"); *Salim v. Mitchell*, 183 F.Supp.3d 1121 (E.D. Wash. 2016) (same). Federal criminalization of genocide is strong evidence, as *Sosa* recognizes, that the customary law and treaty prohibition against genocide is one of the small groups of international law norms actionable under the ATS. And cases seeking to enforce these norms are not subject to dismissal under the political question doctrine for lack of judicially manageable standards. *See id.*

24

For this reason, the D.C. Circuit allowed a lawsuit to proceed where Plaintiffs claimed that Israeli settlers were committing genocide against Palestinians. *Al-Tamimi*, 916 F.3d at 11-12 ("Thus, the ATS—by incorporating the law of nations and the definitions included therein—provides a judicially manageable standard to determine whether Israeli settlers are committing genocide."). Similarly, the Second Circuit rejected the political question doctrine as a basis for dismissal in a case alleging genocide. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir 1995). There, the court reasoned that the "universally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating suits brought under the Alien Tort Act, which obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion." *Id.* at 249 (citing *Filártiga v. Peña–Irala*, 630 F.2d 876 (2d Cir. 1980)).

Accordingly, resolving the issues presented in this case does not involve standards that defy judicial competence or interfere with any discretion committed to the other branches. Simply, the Court must interpret and apply *legal* standards that are judicially manageable and familiar to the courts.

## IV. EVEN IF THIS COURT WERE TO HOLD THAT INJUNCTIVE RELIEF IS INAPPROPRIATE, THE REQUEST FOR A DECLARATORY JUDGMENT IS PLAINLY JUSTICIABLE.

This Court can address Plaintiffs' claim for a declaratory judgment without running afoul of prudential concerns about intrusion into discretionary policy

matters. *Ctr. for Biological Diversity*, 868 F.3d at 829. Plaintiffs' declaratory judgment claim simply requires this Court to interpret and apply the law, which is, after all, "what courts do." *Zivotofsky*, 566 U.S. at 201.

Indeed, the Supreme Court has recognized that the first two *Baker* factors, which center on distinguishing legal issues from policy matters, are the central inquiries in political question analysis. *See Zivotofsky I*, 566 U.S. at 195 (analyzing only first two factors and finding no political question); *see also Mecinas v. Hobbs*, 30 F.4th 890, 901 (9th Cir. 2022) (noting that the Supreme Court has limited political question doctrines "to those few cases" implicating the first two factors and finding case justiciable without analyzing the prudential *Baker* factors); *Sierra Club*, 929 F.3d at 686-87 (same). As demonstrated above, this case does not present a political question under the first two *Baker* factors because there is no textual commitment of authority to the political branches to determine whether the President can violate fundamental international law norms and judicially manageable standards exist to resolve that legal question.

However, even if this Court were to look at the prudential *Baker* factors to determine whether the relief requested would interfere with U.S. foreign policy, Plaintiff's request for declaratory judgment is clearly justiciable. In *Center for Biological Diversity*, this Court analyzed the plaintiff's claim for declaratory relief under all of the *Baker* factors and found it justiciable because it simply required

interpreting and applying a federal law to the Department of Defense's actions but did not compel the Court to "question the wisdom" of federal officials or "intrude on foreign policy judgment." 868 F.3d at 824-26. Similarly, here, a declaratory judgment would address Defendants' legal obligations to comply with the law but would not intrude upon the Executive's policymaking discretion.

This Court must engage in a discriminating analysis of each of the different forms of relief Plaintiffs seek and not assume that concerns about injunctive relief apply as well to declaratory relief. A decision to grant a declaratory judgment does not require judges to "engage in the type of operational decision-making beyond [their] competence" that courts sometimes find is implicated by "the framing of injunctive relief." *See Koohi*, 976 F.2d at 1332 (applying same reasoning to request for damages). Even if injunctive relief is "far more likely to implicate political questions" than requests for a declaratory judgment, *see id.*, this Court has made clear that the two forms of relief must be analyzed separately. *Ctr. for Biological Diversity*, 868 F.3d. at 827. Should the Court decline to grant equitable relief for prudential reasons, the granting of declaratory relief would fulfill the Court's essential obligation "to say what the law is," *Marbury*, 5 U.S. (1 Cranch) at 177, while leaving it to the political branches to determine what specific steps should be taken to comply with the Court's judgment.

## CONCLUSION

For all these reasons, the Court should reverse the district court's decision and find that the case does not present a non-justiciable political question.


Dated: March 14, 2024                    Respectfully submitted,

**CENTER FOR SOCIAL JUSTICE**
**SETON HALL LAW SCHOOL**


By: */s/Jennifer B. Condon*

Jennifer B. Condon
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700
Jenny-Brooke.Condon@shu.edu

JULES LOBEL
3900 Forbes Ave
Pittsburgh, Pa 15260
(412) 648-1375
jll4@pitt.edu

*Attorneys for* Amici *Scholars of Constitutional Law, Federal Courts, and International Law*

## STATEMENT OF AUTHORITY TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Ninth Circuit Rule 29-3, counsel for *amici* asserts that all parties have consented to the filing of this brief.

## STATEMENT REGARDING PARTICIPATION BY PARTIES, THEIR ATTORNEYS, OR OTHER PERSONS

Counsel for *amici curiae* states pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that (1) no counsel for a party authored this brief in whole or in part; (2) that no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and; (3) no person other than *amici curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g)(1) because it contains 6,503 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (Times New Roman) using Microsoft Word in 14-point font.

/s/ Jennifer B. Condon
Jennifer B. Condon

March 14, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-704

I am the attorney or self-represented party.

**This brief contains** 7 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　☐ it is a joint brief submitted by separately represented parties.
　☐ a party or parties are filing a single brief in response to multiple briefs.
　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** Jennifer B. Condon　**Date** 3/14/2004

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/22*

# APPENDIX

**MARTIN S. FLAHERTY, LEITNER FAMILY PROFESSOR OF INTERNATIONAL HUMAN RIGHTS LAW, FORDHAM LAW SCHOOL; VISITING PROFESSOR, SCHOOL OF PUBLIC AND INTERNATIONAL AFFAIRS, PRINCETON UNIVERSITY; VISITING PROFESSOR, COLUMBIA LAW SCHOOL.** Martin S. Flaherty is Leitner Family Professor of Law and Founding Co-Director of the Leitner Center for International Law and Justice at Fordham Law School. He is also a Visiting Professor at the Woodrow Wilson School of Public and International Affairs, where he was Fellow in the Program in Law and Public Affairs and a Visiting Professor at the New School in New York. For the Leitner Center, Human Rights First, and the New York City Bar Association, he has led or participated in human rights missions to Northern Ireland, Turkey, Hong Kong, Mexico, Malaysia, Kenya, Romania, and China. He is also a member of the Council on Foreign Relations. He is currently the Chair of the Council on International Affairs of the New York City Bar Association, where he was formerly Chair of the Committee on International Human Rights, and is a life member of the Council on Foreign Relations. Flaherty's publications focus upon constitutional law and history, foreign affairs, and international human rights and appear in such journals as the Columbia Law Review, the Yale Law Journal, the Michigan Law Review, the University of Chicago Law Review, Constitutional Commentary, the Harvard journal of Law and Policy, the Harvard Human Rights Journal, and Ethics & International Affairs.

**ERIC M. FREEDMAN, SIGGI B. WILZIG DISTINGUISHED PROFESSOR OF CONSTITUTIONAL RIGHTS, MAURICE A. DEANE SCHOOL OF LAW AT HOFSTRA UNIVERSITY** – Professor Freedman is a Professor of Constitutional Rights at the Maurice A. Deane School of Law at Hofstra University. Before becoming a professor, he worked in private practice as a litigator, clerked for Judge Irving R. Kaufman in the U.S. Court of Appeals for the Second Circuit, and studied abroad on a Fulbright Scholarship. He has focused much of his academic research on constitutional law and history and has testified on such matters before Congress and other legislative bodies. Professor Freedman recently provided pro bono representation in issues arising from detention at Guantanamo and other cases related to American efforts to combat terrorism. He is a member of the American Law Institute, a fellow of the American Bar Foundation, and both the director of and counsel for the National Coalition Against Censorship. In addition, he previously chaired the New York City Bar Association's Committee on Civil Rights.

**MICHAEL J. GLENNON, PROFESSOR OF CONSTITUTIONAL AND INTERNATIONAL LAW, TUFTS UNIVERSITY FLETCHER SCHOOL OF LAW AND DIPLOMACY** – Professor Glennon is a Professor of Constitutional and International Law at the Fletcher School of Law and Diplomacy Tufts University. Prior to going into teaching, he was Legal Counsel to the Senate Foreign Relations Committee (1977-1980). He has since been a Fulbright Distinguished Professor of International and Constitutional Law, Vytautus Magnus University School of Law, Kaunas, Lithuania (1998); a Fellow at the Woodrow Wilson International Center for Scholars in Washington D.C. (2001-2002); Thomas Hawkins Johnson Visiting Scholar at the United States Military Academy, West Point (2005); Director of Studies at the Hague Academy of International Law (2006); and professeur invité at the University of Paris II (Panthéon-Assas) from 2006 to 2012. Professor Glennon has served as a consultant to various congressional committees, the U.S. State Department, and the International Atomic Energy Agency. He is a member of the American Law Institute, the Council on Foreign Relations, and the Board of Editors of the American Journal of International Law. He has testified before the International Court of Justice and congressional committees. He is the author of numerous articles on constitutional and international law as well as several books, most recently Free Speech and Turbulent Freedom (OUP, 2024).

**JONATHAN HAFETZ, PROFESSOR OF LAW, SETON HALL UNIVERSITY SCHOOL OF LAW** – Professor Hafetz is a Professor of Constitutional Law, Civil Procedure, National Security Law, and International Criminal Law at the Seton Hall University School of Law. Following law school, he studied in Mexico on a Fulbright Fellowship and clerked for both Judge Jed S. Rakoff of the U.S. District Court for the Southern District of New York, as well as Judge Sandra L. Lynch of the U.S. Court of Appeals for the First Circuit. He went on to become an internationally recognized constitutional and human rights lawyer, working as a senior attorney for the American Civil Liberties Union, a litigation director at New York University's Brennan Center for Justice, and a John J. Gibbons Fellow in Public Interest and Constitutional Law at Gibbons, P.C. Professor Hafetz has represented prisoners from around the world and litigated landmark cases challenging arbitrary detention, rendition, and torture. He has also authored or co-authored more than thirty *amicus curiae briefs* for the U.S. Supreme Court and federal courts of appeals and is the former chair of the New York City Bar Task Force on National Security and the Rule of Law. Professor Hafetz's scholarship focuses primarily on constitutional law, national security, international criminal law, and transnational justice. He has authored numerous articles and books on constitutional and international law, including Punishing Atrocities through a Fair Trial: International Criminal Law from Nuremberg to the Age of Global Terrorism (Cambridge Univ. Press 2018). His

scholarship has been cited by several courts, including the U.S. Supreme Court, and his op-eds have appeared in several prestigious online publications. Professor Hafetz recently received a Fulbright Scholar Award to be a Visiting Professor at Rikkyo University in Toyko, Japan.

**HELEN HERSHKOFF, HERBERT M. AND SVETLANA WACHTELL, PROFESSOR OF CONSTITUTIONAL LAW AND CIVIL LIBERTIES , CO-DIRECTOR, ARTHUR GARFIELD HAYS CIVIL LIBERTIES PROGRAM, NEW YORK UNIVERSITY SCHOOL OF LAW** – Professor Hershkoff is a Professor of Civil Procedure and Federal Courts for the New York University School of Law. Prior to beginning her teaching career, she worked in private practice, as a staff attorney for The Legal Aid Society of New York, and as an associate legal directly of the American Civil Liberties Union. In 1995, New York Magazine named her one of New York's best civil rights lawyers. She went on to become a nationally recognized scholar, focusing much of her research on state constitutions and social and economic rights. She authored the leading Civil Procedure casebook, Civil Procedure: Cases and Materials (with Jack H. Friedenthal, Arthur R. Miller, and John E. Sexton), and she also contributed to the "Wright and Miller" Federal Practice and Procedure treatise, writing about cases where the United States is a party. Professor Hershkoff co-directs the Arthur Garfield Hays Civil Liberties Program and an important part of her scholarship focuses on public interest litigation and the role of the courts in effecting social change. She currently serves on the  boards of the Brennan Center for Justice and of the Urban Justice Center, and helped to establish Party for Humanity, Inc., a non-profit organization.

**JULES LOBEL, BESSIE MCKEE WALTHOUR PROFESSOR OF LAW, UNIVERSITY OF PITTSBURGH LAW SCHOOL** – Professor Lobel is a Professor of Constitutional Law for the University of Pittsburgh School of Law. His areas of academic expertise include International Law, Constitutional Law, and Comparative Law. He has litigated numerous cases concerning constitutional and human rights issues and has represented multiple members of Congress in challenging Presidents of both parties for their unilateral decisions to initiate war. He has also litigated cases challenging certain aspects of U.S. policy towards suspected terrorists, including successfully arguing for habeas corpus rights for Guantanamo detainees in the landmark *Rasul v. Bush* decision. He has authored several articles on international and constitutional law and has edited several books on the U.S. Constitution. Professor Lobel has testified before Congressional Committees, most recently on the Constitutional allocation of war powers before a subcommittee of the House of Representatives Foreign Affairs Committee. He also advised several foreign nations on constitutional law issues and has participated in various Human Rights delegations abroad.

**MARY ELLEN O'CONNELL, ROBERT AND MARION SHORT PROFESSOR OF LAW AND PROFESSOR OF INTERNATIONAL PEACE STUDIES-KROC INSTITUTE, UNIVERSITY OF NOTRE DAME** – Professor O'Connell is a Professor of International Law. Before she began her teaching career, she worked in private practice at an international law firm and served as a Title X professional military educator for the U.S. Department of Defense in Germany. Her work in international law focuses specifically on the use of force, international dispute resolution, and international legal theory. She has authored and edited numerous books, including The Art of Law in the International Community (Cambridge University Press, May 2019; paperback 2020) and The Power and Purpose of International Law, Insights from the Theory and Practice of Enforcement (Oxford University Press, paperback, 2011) (hardback published, 2008). She has also published several law review articles concerning international law and the use of force, particularly concerning armed conflict, the War on Terrorism, and concepts of self-defense.

**MICHAEL J. PERRY, ROBERT W. WOODRUFF PROFESSOR OF LAW EMERITUS, EMORY UNIVERSITY SCHOOL OF LAW** – Professor Perry is a Professor of Constitutional Law at the Emory University School of Law. From 2009 to 2011, he was the University Distinguished Visiting Professor in Law and Peace Studies at the University of San Diego, where he taught an introductory course on international human rights both to law students and to graduate students at the Joan B. Kroc School of Peace Studies. He has authored thirteen books and over eighty-five articles and essays focused on constitutional law and human rights theory, including The Constitution, the Courts, and Human Rights (Yale, 1982) and Human Rights in the Constitutional Law of the United States (Cambridge, 2013). Before he began his distinguished teaching career, he served as a law clerk both to Judge Jack B. Weinstein of the United States District Court for the Eastern District of New York as well as Judge Shirley M. Hufstedler in the U.S. Court of Appels for the Ninth Circuit.

**JOHN B. QUIGLEY, PRESIDENT'S CLUB PROFESSOR OF LAW EMERITUS, OHIO STATE UNIVERSITY MORITZ COLLEGE OF LAW** – Professor Quigley is a Professor of International Law and Comparative Law at the Ohio State University Moritz College of Law. From 1982 to 1983, he was a visiting professor at the University of Dar es Salaam, Tanzania. Before he began teaching, he was a research scholar at Moscow State University and a research associate in comparative law at Harvard Law School. His areas of academic expertise include alternative dispute resolution, human rights, international law, and the law of armed conflict. Professor Quigley has published numerous books and articles on human rights, the United Nations, war

and peace, and the Arab-Israeli conflict. Some of his books include The Genocide Convention: An International Law Analysis (Ashgate Publishing Ltd., 2006) and The Case for Palestine: An International Law Perspective (Duke University Press, 2005). He has published a wide range of academic articles concerning the consequences of issues such as mass displacement, ethnic cleansing, and torture. He has also authored several amicus briefs and has offered expert testimony in federal court and state on international law issues. In 2013, Professor Quigley received an award from the Consulate-General of Mexico for his outstanding contributions to the event of the Signature of the Vienna Convention on Consular Relations.

**KERMIT ROOSEVELT, DAVID BERGER PROFESSOR OF THE ADMINISTRATION OF JUSTICE, UNIVERSITY OF PENNSYLVANIA CAREY LAW SCHOOL** – Professor Roosevelt is a Professor of Constitutional Law and Conflict of Laws for the University of Pennsylvania Carey Law School. He has authored several scholarly books in both fields, including Conflict of Laws (Foundation Press, 2010), which provides an analytical overview of conflicts, as well as The Myth of Judicial Activism: Making Sense of Supreme Court Decisions (Yale, 2006), which discusses how citizens can ascertain whether the Supreme Court is abusing its authority to interpret the Constitution. He has also published many academic articles, including *Choice of Law in Federal Courts: From Erie and Klaxon to CAFA and Shady Grove* for the Northwestern Law Review, as well as *Detention and Interrogation in the Post-9/11 World* for the Suffolk University Law Review. In 2014, he was selected by the American Law Institute as the Reporter for the Third Restatements of Conflict of Laws.

**BETH STEPHENS, DISTINGUISHED PROFESSOR OF LAW, RUTGERS LAW SCHOOL** – Professor Stephens focuses on the enforcement of international norms and on business and human rights. She has published a variety of articles on the relationship between international and domestic law, focusing on the enforcement of international human rights norms through domestic courts and the incorporation of international law into U.S. law. She co-authored a book analyzing U.S. enforcement of human rights norms, International Human Rights Litigation in U.S. Courts (Martinus Nijhoff Publishers, 2d ed. 2008). She has also written on the international law norms governing corporations, including Making Remedies Work: Envisioning a Treaty-Based System of Effective Remedies, in Building a Treaty on Business and Human Rights: Context and Contours (Surya Deva and David Bilchitz, eds. 2017), and *Are Corporations People? Corporate Personhood Under the Constitution and International Law*, 44 Rutgers L.J. 1 (2014). Professor Stephens was an Advisor to the American Law Institute's Restatement (Fourth) of the Foreign Relations Law of

the United States and served as a legal consultant to a network of human rights groups formulating proposals for a new treaty on business and human rights.