No. 24-704

---

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ; AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH; MOHAMMAD HERZALLAH; AYMAN NIJIM; LAILA ELHADDAD; WAEIL ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., *President of the United States*; ANTONY J. BLINKEN, *Secretary of State*; and LLOYD JAMES AUSTIN III, *Secretary of Defense,* in their official capacities,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of California, Case No. 4:23-cv-05829-JSW

---

APPELLANTS' UNOPPOSED MOTION TO DISQUALIFY
JUDGE PATRICK BUMATAY AND JUDGE LAWRENCE VANDYKE

---

Pamela C. Spees
Sadaf M. Doost
Katherine Gallagher
Maria C. LaHood
Diala Shamas
Samah Sisay
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Marc Van Der Hout
Johnny Sinodis
VAN DER HOUT LLP
360 Post Street, Suite 800
San Francisco CA 94108
(415) 981-3000

*Attorneys for Plaintiffs-Appellants*

NOW INTO COURT, through undersigned counsel, come Plaintiffs-Appellants who respectfully request that, pursuant to 28 U.S.C. § 455, Hon. Judge Patrick Bumatay and Hon. Judge Lawrence VanDyke recuse themselves from this matter. Counsel are ethically compelled to bring this motion in light of the facts set forth below that would reasonably give rise to, at a minimum, an appearance of partiality. Defendants informed Plaintiffs that they do not take a position on this Motion, and do not intend to file a response.

As documented below, in March 2024, after the appeal in this case was docketed, Judge Bumatay and Judge VanDyke, as well as Hon. Judge Ryan Nelson, participated in a delegation that brought a number of federal judges to meet with Israeli legal and military officials, and which was explicitly designed to influence U.S. judicial opinion regarding the legality of ongoing Israeli military action against Palestinians—a core question on appeal of this case. This one-sided influence on this question central to the disposition of this case seemingly brought to bear on members of this appellate court could lead a reasonable person to question their impartiality, requiring recusal under 28 U.S.C. § 455, even if Judge Bumatay and Judge VanDyke believe they are able to judge the issues in this case impartially. Faced with precisely the same circumstances detailed below, Hon. Judge Nelson recused himself from participation in this case after he was assigned to the panel hearing the merits of the appeal, in order to avoid an appearance of impropriety. ECF No. 73 (Judge Nelson's

order recusing himself from the appeal). The same considerations warrant recusal of Judge Bumatay and Judge VanDyke from participating in any deliberation in this case, including the decision whether to grant Appellants' petition for rehearing en banc and any rehearing, if ordered by the Court.

This case presents issues of great public concern. Impartiality of the judiciary is deemed fundamental to the system of justice in the United States. Even the appearance of bias or undue influence threatens public confidence, and is of such importance that federal judges are statutorily required to disqualify themselves from any proceeding in which their impartiality might reasonably be questioned. Public perception of justice would also be compromised if these judges considered their ethical obligations differently, in identical circumstances. In the interest of justice and to preserve public confidence in the judicial process, Plaintiffs respectfully request that Judge Bumatay and Judge VanDyke recuse themselves from this case.

## FACTUAL BACKGROUND

This case is brought on behalf of Palestinians in Gaza, Palestinian-Americans and Palestinian human rights organizations against President Biden, Secretary of State Blinken and Secretary of Defense Austin, alleging that these Defendants have violated federal and international criminal law in aiding and abetting genocide against the Palestinian people of Gaza. The case seeks relief in the form of a

declaration that Defendants' conduct is illegal and an injunction ordering Defendants to cease military support for Israel's genocidal actions in Gaza.

The issues on appeal primarily concern whether Plaintiffs' claims are nonjusticiable under the political question doctrine—the basis for dismissal by the district court—and the underlying merits of the case directly raise the factual and legal question of whether the Israeli government's military attacks and related infliction of conditions depriving people of the basic necessities for survival amount to genocide as defined by international law (and thereby render Defendants' actions illegal under binding international criminal law, incorporated into federal statutory and common law). That law distinguishes permissible forms of self-defense or military use of force from the intentional destruction of a population, in whole or in part, based on their racial, religious, ethnic or national identity which rises to a genocide—a crime that permits no justification at law. The district court, while ultimately dismissing the case as nonjusticiable, found Plaintiffs' claims of genocide to be "plausible." 1-ER-6, 10.

On June 3, 2024, the three-judge panel assigned to preside over the appeal was announced and included Hon. Circuit Judge Ryan Nelson, who also participated in the same delegation to Israel sponsored by the World Jewish Congress, a prominent organization that advocates in support of Israeli government actions, in

3

March 2024.[1] After Plaintiffs similarly moved for his recusal, Judge Nelson recused himself from this matter on June 6, 2024, at which point Judge Consuelo Callahan was drawn to replace him. ECF Nos. 73, 74. The appeal of this matter was heard on June 10, 2024. On July 15, 2024, the panel issued a per curiam opinion affirming the trial court's ruling that Plaintiffs' claims presented nonjusticiable political questions. ECF No. 77.

On August 29, 2024, Plaintiffs filed a petition for en banc review of that decision, dkt. 78, necessitating this motion to recuse Judge Bumatay and Judge VanDyke. The reasons set forth in Plaintiffs' motion to recuse Judge Nelson and the reasons that caused Judge Nelson to recuse himself from this case compel the same outcome here. Any different outcome on such an important ethical consideration would risk seriously undermining public confidence in the proceedings of this Court.

The trip Judge Bumatay and Judge VanDyke took along with Judge Nelson was reported in Bloomberg Law[2] as well as on ILTV.[3] In reporting of the trip, Judge

---

[1] *See About WJC*, World Jewish Cong., https://www.worldjewishcongress.org/en/about (last visited Aug. 22, 2024).

[2] Suzanne Monyak, *Trump-Appointed Judges Lead Trip to Israel 'Bearing Witness'*, Bloomberg Law (Mar. 21, 2024), https://news.bloomberglaw.com/us-law-week/trump-appointed-judges-lead-trip-to-israel-bearing-witness (Spees Decl., Ex. A); *see also* Yaakov Lipszyc, *Trial by Fire*, Mishpacha (Apr. 2, 2024), https://mishpacha.com/trial-by-fire/ (Spees Decl., Ex. B).

[3] ILTV (@iltv_israel), Instagram (Mar. 17, 2024), https://www.instagram.com/reel/C4oIDlDNYKO/ (screenshot, Spees Decl., Ex. C); *see also* ILTV Israel News, *WJC Brings Historic Delegation to Israel*, YouTube (Mar. 14, 2024), https://www.youtube.com/watch?v=1wNuBl1ZA7I.

Bumatay and Judge VanDyke were specifically singled out as participants in the delegation.[4] U.S. judges on the delegation are reported to have met with Israeli "government and judicial officials" and "members of the Israel Defense Forces."[5] According to Judge Matthew Solomson, one of the organizers of the trip, the delegation also met with lawyers in charge of Israel's defense against allegations of genocide, who "know their material" and "know the facts." Solomson made clear the primary purpose of the trip when he declared: "There's no way that these claims can end up standing against the nation of Israel. There's no way."[6]

A caption accompanying the video on ILTV's Instagram account states:

> The World Jewish Congress recently facilitated a visit for a delegation of 14 US Federal Judges to Israel. ***This invaluable experience allowed them to delve deeper into the legality of Israel's conduct in the operation.*** Such exchanges foster understanding and cooperation between nations, paving the way for ***informed decision-making***.[7]

The legality of "Israel's conduct in the operation"—whether it constitutes genocide, or presents a serious risk of genocide—implicates Defendants' duties under international law and is thus a central underlying issue in this case.

In addition, according to organizers, the trip's "mission" included meetings with "Israeli legal experts and stakeholders," to provide U.S. judges with "a better

---

[4]    Monyak, *supra* note 2.
[5]    *Id*.
[6]    Lipszyc, *supra* note 2.
[7]    ILTV, *supra* note 3 (emphasis added).

understanding of the impact of the October 7th attacks and the *subsequent response of Israel's legal system*. This visit held special significance as Israel *continues to fight consistent backlash and criticism worldwide*."[8] The March 2024 delegation occurred following the district court's decision concluding that Israel's actions "plausibly" constituted a genocide and after Plaintiffs lodged their appeal in this Court. 1-ER-6, 10; ECF No. 2.[9] Given that this litigation could be seen as part of that "criticism" of Israeli actions that the delegation organizers sought to counter, a reasonable person could perceive this sponsored trip as an attempt to influence jurists' view about the legality of Israel's actions in a manner bearing on the merits of this case.[10]

Judge Solomson acknowledged that, by bringing these federal judges, he shared the organizers' goal of influencing legal opinion in the United States:

> We thought it necessary or important for judges to have an
> up-close view of what happened in Israel on October

---

[8]    *Id.* (emphasis added).

[9]    This delegation also followed an order by the International Court of Justice critical of Israel's actions in Gaza as they constituted a "plausible" genocide and violations of the Genocide Convention. Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (*S. Afr. v. Isr.*), Order, ¶ 54 (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf.

[10]   As part of the delegation, participants visited sites relevant to understanding the history and prevalence of antisemitism as well as the horrors of the Holocaust. To be clear, that is in no way the basis of Plaintiffs' concerns; rather, their concerns stem directly from the appearance that delegation attendees were being influenced on legal and factual questions related to Israeli government-military actions, which are at issue in this litigation.

> Seventh, and their society's reaction to it, to be able to adequately and accurately *report back to those various legal communities upon our return*.[11]

Judge Solomson is also quoted in an interview as saying: "I think it's helpful for influential legal scholars to have a fulsome understanding of what Israel is dealing with. *Will it have some impact on kind of [sic] the broader legal community when we go home? I hope so*."[12] More, Solomson acknowledged that the delegation met with Israel's legal teams "in charge" of defending against allegations of genocide – the very allegations at issue in this matter.[13] In this case, a reasonable person could believe that this prominent delegation not only would have a *general* impact on the "broader legal community," but that the delegation could have a *specific* impact on *particular* participating jurists—Judge Bumatay and Judge VanDyke—who would be concretely called upon to adjudicate this contested legal and factual dispute.

Echoing the goal of influencing U.S. judicial opinion, the chief marketing officer for the World Jewish Congress reportedly said the group sponsored the trip "to bring individuals considered to be 'influencers' to Israel," and that "[j]udges are 'the most influential people we can find because they're not coming at it from a political agenda,' but rather from a fact-finding role."[14]

---

[11]    Monyak, *supra* note 2 (emphasis added).
[12]    ILTV, *supra* note 3 (emphasis added); *see also* transcript of interview at Spees Decl., Ex. D.
[13]    Lipszyc, *supra* note 2.
[14]    Monyak, *supra* note 2.

## ARGUMENT

The federal recusal statute requires that a judge "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Recusal will be justified either by actual bias or appearance of bias and is appropriate where a reasonable person with knowledge of all the facts could conclude that the judge's impartiality might reasonably be questioned. *Yagman v. Republic Ins.,* 987 F.2d 622, 626 (9th Cir. 1993). "If it is a close case, the balance tips in favor of recusal." *United States v. Holland*, 519 F.3d 909, 912–13 (9th Cir. 2008) ("Disqualification under § 455(a) is necessarily fact-driven and . . . must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue.") (internal quotations omitted). Critically, what matters is not whether Judge Bumatay or Judge VanDyke personally believe they can judge this case fairly—a point Plaintiffs do not seek to question; the issue is an objective one, regarding the mere public appearance of impropriety.

In light of the details and facts contained in the reporting above, an objective view of these judges' participation in the delegation—a delegation which appears designed to influence U.S. judicial opinion regarding the legality of Israeli government actions that are a core issue in this case—raises an appearance of impropriety; that is, a reasonable person with knowledge of all the facts might have

8

reason to question the impartiality of Judge Bumatay and Judge VanDyke in this case. This is the conclusion Judge Nelson correctly arrived at in deciding to recuse himself, and compels the same result here.

In addition, the statute requires disqualification of a judge when "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). A judge should disqualify himself on this basis only when the knowledge is obtained from an extrajudicial source. *United States v. Winston*, 613 F.2d 221, 223 (9th Cir. 1980); *Liteky v. United States*, 510 U.S. 540, 554 (1994) (defining "extrajudicial source" as "an opinion held by a judge [that] derives from a source outside judicial proceedings"). The delegation was an extrajudicial source of information, which was avowedly designed to influence "disputed evidentiary facts" that are at issue in this case. One of the lead delegates expressed his "hope" that the trip would "have some impact on kind of the broader legal community" in the United States, and the Bloomberg Law article noted that the judges traveled in their "personal capacities."[15] The trip's aim to influence U.S. jurists would appear to a reasonable person to have an impact not only on "the broader legal community," but upon particular judges who participated and who would be adjudicating the very questions that the delegation was designed to influence.

---

[15]     ILTV, *supra* note 3; Monyak, *supra* note 2.

Further, according to Canon 2 of the Code of Conduct for United States Judges, related to "Outside Influence":

> A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge.[16]

Yet, as described, an avowed goal of the organizers of the delegation of which Judge Bumatay and Judge VanDyke were a part was to bring "'influencers' to Israel," because "[j]udges are 'the most influential people [they could] find,'"[17] and to thereby influence "informed decision-making" by federal judges on a highly contested question about the "legality of Israel's conduct in the operation."[18]

Because the reported purpose of the WJC delegation avowedly was to "delve deeper into the legality of Israel's conduct" in its operations via one-sided meetings with Israeli officials and soldiers, and because the "decision-making" in this appeal involves the very questions trip organizers sought to influence, a reasonable person with knowledge of the facts would question whether participation by Judge Bumatay

---

[16]     Canon 2(B), *Code of Conduct for U.S. Judges*, 2 Guide to Judiciary Policy Pt. A (Mar. 12, 2019), https://www.uscourts.gov/sites/default/files/code_of_conduct_for_united_states_judges_effective_march_12_2019.pdf.

[17]     Monyak, *supra* note 2.

[18]     ILTV, *supra* note 3.

and Judge VanDyke in this delegation could make them impartial.[19] Recusal in this important case is necessary to ensure the appearance of fairness to the parties and promote the integrity of our legal process.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants respectfully submit that Hon. Judge Bumatay and Hon. Judge VanDyke should be disqualified from en banc consideration of this petition as well as en banc review should Plaintiffs' request be granted.

Dated: August 30, 2024      Respectfully submitted,

/s/*Pamela Spees*

| | |
|---|---|
| Marc Van Der Hout | Pamela C. Spees |
| Johnny Sinodis | Sadaf M. Doost |
| Van Der Hout LLP | Katherine Gallagher |
| 360 Post Street, Suite 800 | Maria C. LaHood |
| San Francisco, CA 94108 | Diala Shamas |
| (415) 981-3000 | Samah Sisay |
| ndca@vblaw.com | Center for Constitutional Rights |
| | 666 Broadway, 7th Floor |
| | New York, NY 10012 |
| | (212) 614-6430 |
| | pspees@ccrjustice.org |
| | sdoost@ccrjustice.org |
| | kgallagher@ccrjustice.org |
| | mlahood@ccrjustice.org |
| | dshamas@ccrjustice.org |
| | ssisay@ccrjustice.org |

---

[19] *Id.*

11

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) and Circuit Rule 27-1(1)(d) because it is 11 pages long and contains 2,495 words.

This brief complies with the typeface and type style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5)–(6) and Circuit Rule 27-1(1)(c) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

Dated: August 30, 2024        Respectfully submitted,

                              */s/ Pamela Spees*
                              PAMELA SPEES

No. 24-704

---

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

DEFENSE FOR CHILDREN INTERNATIONAL – PALESTINE; AL-HAQ;
AHMED ABU ARTEMA; MOHAMMED AHMED ABU ROKBEH;
MOHAMMAD HERZALLAH; AYMAN NIJIM; LAILA ELHADDAD; WAEIL
ELBHASSI; BASIM ELKARRA; and DR. OMAR EL-NAJJAR,

*Plaintiffs-Appellants*,

v.

JOSEPH R. BIDEN, JR., *President of the United States*; ANTONY J. BLINKEN,
*Secretary of State*; and LLOYD JAMES AUSTIN III, *Secretary of Defense,* in
their official capacities,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Northern District of
California, Case No. 4:23-cv-05829-JSW

---

DECLARATION OF PAMELA C. SPEES IN SUPPORT OF
MOTION TO DISQUALIFY HON. JUDGE PATRICK BUMATAY
AND HON. JUDGE LAWRENCE VANDYKE

---

I, Pamela C. Spees, do hereby declare and state as follows:

1. I am counsel for Appellants in this action and submit this declaration in
support of their Motion to Disqualify Hon. Judge Patrick Bumatay and Hon. Judge
Lawrence VanDyke.

2. Attached as Exhibit A is a true and correct copy of Suzanne Monyak,
*Trump-Appointed Judges Lead Trip to Israel 'Bearing Witness'*, Bloomberg Law

(Mar. 21, 2024), https://news.bloomberglaw.com/us-law-week/trump-appointed-judges-lead-trip-to-israel-bearing-witness (annexed hereto). The article reports that fourteen federal judges traveled to Israel in March 2024 as part of a delegation sponsored by the World Jewish Congress, and specifically mentions Hon. Judge Bumatay and Hon. Judge VanDyke.

3.     Attached as Exhibit B is a true and correct copy of Yaakov Lipszyc, *Trial by Fire*, Mishpacha (Apr. 2, 2024), https://mishpacha.com/trial-by-fire/. In it, Judge Matthew Solomson is interviewed about the judges' trip, including the purpose of the delegation and meetings with Israeli leaders, as well as lawyers on Israel's legal teams charged with defending against allegations of genocide.

4.     Attached as Exhibit C is a true and correct copy of a screenshot of an Instagram reel posted to the account of ILTV (@iltv_israel) on March 17, 2024, which I captured on June 4, 2024. The caption to the post states that "The World Jewish Congress recently facilitated a visit for a delegation of 14 US Federal Judges to Israel," which allowed them "to delve deeper into the legality of Israel's conduct in the operation." The segment reporting on the judges' delegation also includes interviews with some of the judges, and footage of their visits to different sites. The video is available at https://www.instagram.com/reel/C4oIDlDNYKO/.

5.      Attached as Exhibit D is a true and correct copy of a transcript of the audio of the video posted to the ILTV Instagram account as Exhibit C, transcribed by Sharp Copy and Transcription on June 3, 2024.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 29th day of August 2024, in New York, New York.

_____
Pamela C. Spees

# EXHIBIT A

We use cookies.   Learn More                                              Accept

US Law Week
March 21, 2024, 12:07 PM EDT

# Trump-Appointed Judges Lead Trip to Israel 'Bearing Witness'

By Suzanne Monyak

- 14 judges make trip, including Trump circuit, trial court members
- Met with officials, judges; partly focused on Oct. 7

More than a dozen federal judges, nearly all appointed by Donald Trump, traveled to Israel to discuss the country's legal system, military compliance with international law, and aftermath of the October attack by Hamas.

The four-day trip this month sponsored by the World Jewish Congress included Patrick Bumatay and Lawrence VanDyke of the US Court of Appeals for the Ninth Circuit, DC Circuit Judge Neomi Rao, and Sixth Circuit Judge Amul Thapar, all Trump appointees. Two others nominated by Barack Obama and George W. Bush also made the trip.

Of the 14 who went, three are trial court judges, eight serve on the US circuit courts, and three are members of the US Court of Federal Claims. All traveled in their personal capacities. Roughly half of the group was Jewish, while the remainder have other religious affiliations, according to organizers.

Federal Claims Court Judge Matthew Solomson, who organized the trip alongside Judges Roy Altman of the Southern District of Florida and Lee Rudofsky of the District of Arkansas, said the visit was "about bearing witness to atrocities."

"We do interact with academic communities, with student communities, broader legal communities where we live, the bar," Solomson said. "We thought it necessary or important for judges to have an up-close view of what happened in Israel on October Seventh, and their society's reaction to it, to be able to adequately and accurately report back to those various legal communities upon our return."

Judges who spearheaded the trip have been outspoken in their support for Israel in its war with Hamas, which has sparked backlash over civilian casualties.

Solomson posted on LinkedIn last year that he wouldn't hire law clerks who he believed had expressed support for Hamas.

Rudofsky sent an email to his future law clerks and interns also last year asking them to notify him if they, or any organization they were part of, had done anything that could be seen as antisemitic or in support of Hamas.

Altman has discussed the conflict in several opinion pieces and spoken on panels, and has said his comments aren't in his judicial capacity.

**Israeli Officials**

Sara Friedman, chief marketing officer for the World Jewish Congress, said the trip was one of many it sponsors to bring individuals considered to be "influencers" to Israel and learn more about the country and its challenges. Participants have included lawyers, financial professionals, professors, and a cheerleader for the NFL's New England Patriots, she said.

Judges are "the most influential people we can find because they're not coming at it from a political agenda," but rather from a fact-finding role, she said.

The group met with Israeli government and judicial officials, including Amir Ohana, speaker of Israel's legislative body, the Knesset, former Israeli President Reuven Rivlin, members of the Israel Defense Forces, and Israel Supreme Court Justice Ofer Grosskopf, according to an itinerary provided by WJC.

They visited sites related to the Oct. 7 attack, including the Nova festival grounds and Kibbutz Be'eri, watched a film containing footage from body cameras of the Hamas attackers, and met with victims and families of hostages held by Hamas.

The judges also met with Stephanie Hallett, deputy chief of mission at the US Embassy in Jerusalem, and with Palestinian activist Samer Sinijlawi.

Solomson said there was no discussion of visiting Gaza due to safety concerns.

**International Trips**

The trip comes amid heated debate over the Biden administration's decision to continue to provide support to Israel in its war against Hamas, even as the Palestinian death toll climbs.

The World Health Organization warned on Monday that famine is "imminent" in northern Gaza, where between 12.4% and 16.5% of children under five are seriously malnourished. More than 30,000 Palestinians have been killed in the conflict, according to Gaza's health ministry.

Federal judges have also recently faced increased public scrutiny over paid trips and vacations, and at times, judges' failure to disclose them. The judicial branch had no role in organizing the judges' visit to Israel, a spokesperson for the Administrative Office of the US Courts said.

Duke University law professor Veronica Root Martinez, who specializes in legal ethics, said that as long as the judges disclose travel as legally required, the visit looks like "a 'learning' trip that does not run afoul of the code of conduct" for federal judges.

Judges are prohibited from engaging in political speech but their code of conduct permits them to "engage in extrajudicial activities."

And judges said these types of educational trips abroad are not uncommon--even to conflict zones.

A Ukrainian judge told Duke Law's Bolch Judicial Institute earlier this year that judges from California had visited Ukraine and met with counterparts across the country. Ukraine's been at war with Russia for more than two years.

Judge Timothy Tymkovich of the US Court of Appeals for the Tenth Circuit, who was also on the Israel visit, said trips to meet judges from other countries foster "an international dialogue on common issues that judges have everywhere."

Tymkovich, who is of Ukrainian descent, said he has visited Ukraine on judge trips four times, though not since Russia's 2022 escalation of the conflict. There were "fewer differences than you'd expect" between the conflicts in Ukraine and in Israel, he said.

"Continuing your day-to-day business with the overlay of a military threat is a different way to have to do business," he said.

"We haven't had to face armed conflict on our borders in this country for a long time. It's very humbling to think about judges and lawyers who do face that conflict, and how I shouldn't take for granted the relative cause of the success that we've had," Tymkovich added.

To contact the reporter on this story: Suzanne Monyak at smonyak@bloombergindustry.com

To contact the editors responsible for this story: Seth Stern at sstern@bloomberglaw.com; John Crawley at jcrawley@bloomberglaw.com

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved

# EXHIBIT B



| MAGAZINE FEATURE |

# TRIAL BY FIRE



By <u>Yaakov Lipszyc</u> | APRIL 2, 2024

### Judge Matthew Solomson and friends bear witness to the unthinkable



*Photos: Eli Greengart, World Jewish Congress*

*When Federal Claims Court Judge Matthew Solomson was first appointed to the bench, he was concerned about the ramifications of wearing his yarmulke: In such a high-profile position, with billions of dollars often at stake, might it be cause for a chillul Hashem? Today, though, he's more interested in kiddush Hashem, having brought a group of federal judges to Israel to bear witness to an enemy's unthinkable atrocities*

Over the months since October 7, the tortured remnants of the Gaza border kibbutzim have become Exhibit A in Israel's battle for the narrative about the justice of the ongoing war. Among the world leaders and influencers pilgrimaging to the site of horrors, though, few were as closely-connected to the cause of justice itself as the group who visited in recent days.

Headed by Federal Claims Court Judge Matthew Solomson, an Orthodox Jew, more than a dozen US federal judges converged on Israel last week to discuss the country's legal system and military compliance with international law, but mostly, to see up-close the aftermath and fallout of the Hamas massacre and the IDF's unprecedented and unenviable challenges in ferreting out a terror infrastructure among a civilian population.

Solomson, who organized the trip alongside Judges Roy Altman of the Southern District of Florida and Lee Rudofsky of the District of Arkansas, explained the importance of "bearing witness to the atrocities."

Actually, the judges' journey to Israel was on the table last summer, although not for the purpose it eventually served. Back then (if our memories can stretch just a bit beyond October 7), Israeli society was deeply divided over Prime Minister Binyamin Netanyahu's push for judicial reform. This dispute had become the talk of legal circles worldwide, prompting Judge Solomson's desire to grasp firsthand what was at stake. While the massacre of October 7 might have derailed the original plan, over time Judge Solomson realized there was a new and more urgent reason to travel to Israel.

"I said to myself, well, nobody's worried about judicial reform anymore. But it seemed to me there was still a trip that should take place," Judge Solomson tells *Mishpacha*. And so, the three judges began compiling a list. "We always hear a lot about bearing witness to the Holocaust, but somehow the level of denial in the world about what happened on October 7 in Southern Israel is, for me, almost impossible to fathom. There's enough out there without having to see it in person. The idea that people could deny it or the extent of it is just shocking."

Half of the 14 judges on the delegation were non-Jewish, including Patrick Bumatay and Lawrence VanDyke from the US Court of Appeals for the Ninth Circuit, and Sixth Circuit Judge Amul Thapar, but the response was unanimous.

"The judges were totally moved and affected by the realities of what happened on October 7," says Sarah Friedman, Chief Marketing Officer of the World Jewish Congress, who sponsored the trip. "I think to the non-Jewish judges, the trip absolutely changed their perspective on the conflict. They were able to see that Hamas' only objective is to kill and torture Jews and that October 7 was not about the liberation of the Palestinians or about the creation of a Palestinian State."

The itinerary included the requisite visits to the Knesset and to several elder statesmen, but what surprised him was an invitation to meet with Supreme Court Justice Ofer Grosskopf and hold discussions with the IDF legal team.

"We were all impressed with the level of care that the IDF puts into attempting to minimize civilian casualties. We watched many video clips of IDF lawyers calling off strikes because there were people around. In our country, the lawyers give advice. In the IDF, the lawyers are literally given a veto and can stop an initiative or a strike."

The first morning of the trip, when the judges were to be shown a private screening of the now-famous harrowing 47-minute video — filmed by Hamas terrorists with their own body cams — Judge Solomson got a call from his two daughters.

"Abba," they said, "you already know the truth. They don't need to persuade you. So why should your *neshamah* be exposed to this terrible stuff? Why do you need to see all that?"

Before the screening, the judges were given a preliminary presentation by a young female soldier who'd been on the team tasked with compiling the video. The soldier explained what they were about to see and then fielded questions from the group, when Judge Solomson spoke up.

"My two daughters, who look to be about your age, asked me not to watch it," he told the young IDF spokeswoman, "but I'd like your opinion. Do you want me to watch it?" She said that, given his position of influence, it was important to watch.

Judge Solomson and the other 13 federal judges, many of them on the shortlist for the Supreme Court, emerged from the screening as different people. Perhaps the most significant impact was on Judge Solomson himself. While he'd already made headlines last October when he became the first judge to refuse to hire clerks who had expressed pro-Hamas sentiments, that 47-minute video was undoubtedly the starkest reality check of the trip (it was shown in Congress and in certain other US venues, but knowing those unspeakable atrocities happened just a few miles from where they were sitting took the experience to a different level).

"One of the judges is a former prosecutor and defense lawyer," says Judge Solomson, "and he told me the night before that he was going to watch the entire thing and not flinch, because, he told me, 'I've seen it all. I've seen so many dead bodies you can't imagine. I don't care. It's all clinical to me.' After the video, he was stunned. He said he'd never seen anything like that in his entire life."

After the screening, says Judge Solomson, "You saw all these highly educated, very successful people kind of just go off into their own corners, like you can't look at another person. It's so overwhelming and you're kind of embarrassed to have watched that stuff. It was three p.m. and I went up to a young *chayal* in the courtyard and asked, '*Eifo Yerushalayim?*' He pointed, so I started davening Minchah. That was all I could do."

Getting first-hand reports of military strategy just reinforced what the judges generally knew: that the allegations of "genocide" are patently absurd. "If the IDF wanted to kill people indiscriminately, it could do so. It has the potential. It has the air power. It doesn't want to. That's not the way the Jewish people behave," Judge Solomson says. "The term 'genocide' was coined surrounding the Holocaust. And to turn it around and use it to describe what Jews are doing to defend themselves is disgusting. You know, there are Uighurs being persecuted in concentration camps by the Chinese. Nobody says a word. The Syrians killed Palestinians en masse. Nobody says a word. There are massacres in Africa. Nobody says a word. ISIS, you wait and see what the Russians will do about what ISIS just did. And you know, we know what the Russians did in Chechnya. Nobody says a word. But when Jews defend themselves, all of a sudden, it all becomes too much. It's grotesque."

Yet having met Israel's legal teams, Judge Solomson is quite optimistic. "We met with the lawyers who are in charge of that defense, and they are phenomenal. They know their material and they know the facts. And, in the long run, what do we always say? '*Sheker*' stands on one leg, right? There's no way that these claims can end up standing against the nation of Israel. There's no way."

# ON

October 11, just four days after the Hamas massacre, Judge Matthew Solomson grabbed national headlines by becoming the first judge to announce that he wouldn't hire clerks who had signed any advertisement or put their names on letters supporting the Hamas attack.

"I refuse to credential anyone who supports or even remotely sympathizes with terror in the form of a modern-day pogrom," Judge Solomson wrote in his post. "This is not an unfair or hyperbolic Nazi comparison." Judge Solomson's comments came on the heels of law students signing statements viewed as blaming Israel for the Hamas attacks, prompting several law firms to withdraw job offers as a result.

In hindsight, he not only stands by his proclamation, he says he would do it again. Moreover, he claims to have received support even from the most unexpected quarters.

"Another judge from my court approached me and said, 'Obviously, I wouldn't accept someone who had signed that — It doesn't even need to be clarified. If I get groups like these on a résumé, it goes right in the trash.'"

When asked if he faced any negative repercussions, Judge Solomson was unequivocal. "There was no blowback. There was some question about whether it was political in nature and therefore inappropriate for me to make such a statement, or perhaps unethical because we're not allowed to engage in politics."

Judge Solomson says that his stance is a moral one, and not an attempt to shout down political disagreements. "Since when is being opposed to a bloodthirsty terror organization a question of Democratic or Republican politics? It's not a political issue to say that I'm against a group that sends death squads into Israel to kill Jews. So I just reject the contention that it's political — and I received many messages from people who were happy that I put that message out there."



**M**atthew Hillel Solomson was born in 1974 in Hartford, Connecticut, although pinpointing his childhood to just one city would probably be inaccurate. Being the son of a military couple — his parents, Colonel Dr. Ronald and Mrs. Fern Solomson — meant that the family relocated numerous times during young Matthew's childhood. He was raised in a "traditionally Jewish" household where kashrus was observed, and despite the challenges posed by constant moves, his parents ensured he grew up with a strong connection to Judaism.

"Depending on the city, I either attended a religious day school or a traditional school, or sometimes if we were living in a smaller community without a Jewish school, my parents would hire tutors for me. That's what happened when we were in Hawaii."

He remembers how, in Hawaii, they were living on an army base and his father built a succah in the front yard of his quarters on the base.

"A military police officer pulled over," Judge Solomson remembers, "but my father was already a high-ranking officer, so, very politely, the military police officer said to him, 'Sir, you know, you don't have a permit. What are you building anyway?' So my father explained to him what a succah was. Then the officer said, 'Okay, I guess that's fine.' That's how I grew up."

Like many aspects of Judge Solomson's life, his journey toward Orthodox life came from an unexpected direction. When it came time to apply to universities, his father insisted that he try for Brandeis University, where at least 50 percent of the students were Jewish at that time.

At Brandeis, Matthew was exposed to the Orthodox world. "I had many friends who identified as Modern Orthodox, and that generated a lot of questions for me," he says. "I went to the Conservative rabbi on campus and just didn't feel like my questions were getting answered. So I started asking my *frum* friends instead, and started going to the beis medrash to learn at night. And, I don't know, I just started with a little bit of Gemara and a little bit of *Mishnah Berurah*, a little bit of Rashi... and then I met my wife there."

The Solomsons settled in Silver Spring, MD, where Matthew would later continue his legal career at the University of Maryland, but before that, they decided to try living in Israel for a year so that Matthew could experience learning Torah in a real yeshivah. For the first six months, he was at Yeshiva Ohr Somayach, and during that year, he encountered Rabbi Aaron Lopiansky.

"We already owned a house in Silver Spring, and on one occasion, I asked Rav Aaron, 'Do you think I could pull off just being in yeshivah in Silver Spring?' And his advice was that I had to decide whether the year I took off was in order to spend time in the Holy Land or just to be immersed in learning. And if it was for learning, then I should be wherever I'm going to be learning best. We put our heads together, we came back, and I learned in the Yeshiva of Greater Washington where Rav Aaron has been ever since."

After graduating with honors as a lawyer, Dr. Solomson clerked for Judge Francis M. Allegra of the US Court of Federal Claims (where he is now himself a judge).

"After law school, you apply to clerkships and you pray. I had an interview with Judge Allegra, who was Catholic and almost became a priest. I come in to the interview with him, and he's got this massive picture of the Pope hanging on the wall. I say to myself, 'Oh, well, we're not going to have very much in common....' But in the course of talking with me, he asks me what I like to do in my spare time. So I tell him, 'Well, I've got two kids and I like to play tennis and I'm studying for my rabbinic ordination.' And he says, 'Oh, really? What denomination?' And I say, 'Orthodox.' And he says, 'Really? Well, I went to Catholic seminary in Cleveland, and it was right next to a very famous rabbinical school. Do you know its name?' So I say, 'Telz, but it's spelled like Telshe.' And he says, 'Yeah, that's the one! It was right next door to my seminary.' We had a conversation about that, and he made me the offer the next day."

Clerking was good for his résumé, and then Dr. Solomson pursued a successful private practice. Happily married with a growing family and a stable job, life seemed good enough to not run after changes. However, there were more surprises to come.

**B**ecoming a judge isn't something you can exactly plan for. At best, one can excel as a lawyer and then hope to receive a call from someone well-connected. According to Judge Solomson, one of the jokes in the legal world is that the best way to become a judge is to be the college roommate of a future senator or president.

Judge Solomson was appointed by then-President Donald Trump to the federal claims court (he was never Trump's roommate). The claims court hears cases involving claims for money against the federal government, which was related to his practice.

"My law practice very much centered around the subject matter of the claims court — tax law, intellectual property law, all sorts of monetary claims against the government, including almost the entire range of government contracts issues. So anything having to do with government contracts can come to our court. And my practice was in government contracts and healthcare," explains the judge. "At some point in my practice, I decided to write a book about the subject matter of the court. It was like a *Shulchan Aruch* about our court lobby."

Apparently, within the legal world, the book made quite an impact. One day, while working for a major health care company, Judge Solomson received a call from a friend who worked for the Department of Justice. "Send me your résumé!" he said.

"No way," said Judge Solomson. "I've got a great job, and I'm not looking to go back to the Department of Justice." His friend placated him, reminding him that one of the functions of his department is to vet judges.

"So I said, 'Yeah? For what court?' And he said, 'Well, I can't tell you, but you may have written something about it....' Soon afterward, I got a call from the White House, from President Trump's legal office, to come interview. That was in April of 2017."

It was also the second day of Pesach. "I remember saying to my wife, 'We're going to have to spend Yom Tov in Washington. I'll daven Shacharis and then walk ten miles to the White House....' And she said, 'Are you crazy? Tell them you'll do it after the holiday.'"

The future judge gathered his courage and asked the White House to postpone the meeting date, something they readily accepted.

But one question remained: Upon becoming a federal judge, should he hide the symbols representing him? Or, on the contrary, would he become the first federal judge with a yarmulke?



**E**mbedded within Maryland's Orthodox community, the Solomson family — members of the Ohr HaTorah congregation led by Rabbi Michoel Frank — flourished under the steadfast presence of Torah within their home, defining not only their children's upbringing but Judge Solomson's personal pursuits, as he dedicated himself to acquiring semichah and continuously refining his *limud*. Immersed in a kollel where he even conducts *chaburos*, he has cultivated close personal bonds with rabbinic figures such as Rabbi Lopiansky, Rabbi Mordechai Willig, and Rabbi Yitzchak Breitowitz.

Yet, the question of public appearance remained a quandary: to kippah or not to kippah?

Interestingly, Judge Solomson's inquiry didn't stem from a desire to conceal his identity. Rather, his primary concern was the concept of *chillul Hashem*. Seeking counsel from his close friend, Rabbi Binyamin Silver of Young Israel of Long Beach, he posed the pivotal question.

"The question originally was about when he was first nominated for the judgeship. Should he sit for the nomination wearing a yarmulke or not?" Rabbi Silver told *Mishpacha*. "He basically assumed that if he'd wear a yarmulke to the confirmation hearing, that would smooth the way for him to wear a yarmulke on the bench. And if he didn't, it wouldn't be right to be confirmed without a yarmulke and then suddenly show up day one as a federal judge wearing one. But it

was never about, 'Oh, am I comfortable or uncomfortable wearing a yarmulke?' That was never the question. The question simply was, 'I'm concerned that if I wear a yarmulke, and I have to make certain rulings — and those could be multi-billion-dollar rulings against major corporations suing the United States of America, generating a lot of nasty headlines… could there be a potential *chillul Hashem*. Are they going to pin it on me as a Jew?' "

Rabbi Silver addressed the question as both a spiritual leader and a close friend. "Look," he told Judge Solomson, "there are many prominent Jews in the world, and many of them carry very prominent public roles. And by that logic, nobody should wear a yarmulke because we're always going to be concerned that maybe something will go wrong and cause a *chillul Hashem*. So I would say the opposite: Demonstrate proudly who you are and what you stand for, and always do your best to make a *kiddush Hashem*."

Today, Judge Solomson says he encourages others leaning in that direction to be visibly Orthodox. "I think we give each other strength when we see each other wearing a yarmulke in professional settings."

Since returning from the Israel trip with his colleagues, Judge Solomson has taken it upon himself to deliver talks and organize gatherings for anyone interested in hearing the unvarnished truth about Israel and its war against Hamas. The day after we spoke, he was scheduled to speak at none other than Harvard University.

"The Jewish Legal Students Association at Harvard is actually reluctant to do Israel events," the judge explained to me. "So I said to the person in charge, 'Why don't we have it co-sponsored by the Federalist Society [an academic society that hosts a variety of views through a conservative lens. Many of the judges appointed in the Trump administration were members of the Federal Society]?' But then my Harvard contact told me that they already have an event going on that same time that they're going to have me up tomorrow. So I asked, 'Who's the other judge that's speaking for them?' It happened to be none other than Judge Ryan Nelson… who had participated in our trip! I reached out to Judge Nelson and he told me, 'I was going to speak on the First and Second Amendments. Forget that. Let's do a talk about the Israel trip together!' "

A day after the talk with Judge Nelson at Harvard, I reached out to Judge Solomson to see how it went. "We had a friendly audience," he messaged me, "but I heard from a Jewish student who said that her classmates still deny that Hamas killed any babies on October 7. Some people — especially those on college campuses — are living in an alternate reality."

But he's not giving up. "Judges still have a certain informal influence on society," he says. "We have a voice that extends outside of the courtroom. And we have to confront those who try to bury the truth."

*(Originally featured in Mishpacha, Issue 1006)*

## RELATED CONTENT



RIKI GOLDSTEIN

## FOR THE SAKE OF A NATION
Reb Yidele of Dzikov walked among men but lived in the world of angels



| GEDALIA GUTTENTAG |

## NIGHTMARE WITHOUT END

Jon and Rachel Goldberg-Polin will do whatever it takes to get their son back alive



| AVI BLUM, ESQ |

## BRIDGING THE DIVIDE

With a war raging as his tenure ends, Chief Rabbi David Lau faces the most loaded issues of his career

+ SEE ALL

## SIGN UP TO OUR NEWSLETTERS

Email Address

**SIGN UP NOW**

ABOUT
SUBSCRIPTION
ADVERTISE

HELP CENTER
CONTACT
LOGIN

  

# EXHIBIT C

*Instagram*

Log In  Sign Up



**ILTV NEWS**

**LEE P. RUDOFSKY**
**US DISTRICT JUDGE**

**far is**

**iltv_israel** ✔ • Follow
Original audio

**iltv_israel** ✔ The World Jewish Congress recently facilitated a visit for a delegation of 14 US Federal Judges to Israel. This invaluable experience allowed them to delve deeper into the legality of Israel's conduct in the operation. Such exchanges foster understanding and cooperation between nations, paving the way for informed decision-making.

#WorldJewishCongress #Israel #LegalExchange #InternationalRelations #YadVashem #Hamas #US

11w

**248 likes**
March 17

Log in to like or comment.

# EXHIBIT D

1

**Video**

**0:00:00 to 00:04:14**

**Narrator:** Earlier this week the World Jewish Congress facilitated a significant educational mission bringing a delegation of 14 federal judges from the U.S. to Israel.

**U.S. District Judge Lee P. Rudofsky:** It was important for me to be here to be part of this educational experience and specifically to bear witness to the atrocities of October 7th. Most of us are community leaders back home, and I think it is really important that we're here with our own eyes and our own ears seeing the horrors that happened, hearing the story, hearing the trauma that people have, so we can bring that information back to the United States.

**Narrator:** The mission provided a crucial opportunity for direct interaction with Israeli legal experts and stakeholders, and these judges were interested in gaining a better understanding of the impact of the October 7th attacks and the subsequent response of Israel's legal system. This visit held special significance as Israel continues to fight consistent backlash and criticism worldwide.

00:01:00

**Judge David R. Stras, Eighth Circuit Court of Appeals:** I think it's just really important to understand what people all around the world go through, to understand the problems that people have. I think it's important to see what happened here, to understand what happened here, and more importantly to see how Israelis have

2

banded together and have united against a common foe in an attempt to try to defend themself. The other thing is, quite frankly, this trip has taught me—I went and saw Masada on Saturday—how many times the Jewish people have been attacked, how many times they've had to defend their own freedoms, and how resolute the Jewish people and certainly Israelis are in the face of adversity.

**Judge Matthew Hillel Solomson, U.S. Court of Federal Claims:** I think it's helpful for influential legal scholars to have a fulsome understanding of what Israel is dealing with. Will it have some impact on kind of the broader legal community when we go home? I hope so. I hope people will bring their stories back of what they've seen here and kind of report that back in an accurate and faithful way to what they've seen.

00:02:01

**Narrator:** The judges' visit included a powerful and moving itinerary including a guided visit to Yad Vashem and a memorial at Mount Herzl, the cemetery for fallen soldiers. These visits were especially poignant in the wake of October 7th and as Israel continues their fight against Hamas.

**U.S. District Judge Lee P. Rudofsky:** I think what has stuck out to me so far is our visit to Yad Vashem. I've been there a couple of times but, you know, every time is just as hard. And it's really an understanding of what happens if good people don't stand up to bad people. And the way I really think about it is in terms of anti-Semitism at home in the United States, and that the real fear is that the great majority will just—not so much go along, but not stand in the way. And that's something we all have to worry about, because things can get very bad very, very quickly.

3

**Narrator:**      Not only an insightful visit, but also an inspiring one, as the judges left Israel with a greater understanding of the importance of a Jewish state and reminder that we must never bow down to evil.

00:03:08

**U.S. District Judge Roy K. Altman:**      My message here, especially having been at Yad Vashem today, is how important it is for us to remember our history, to remember that this is the ancestral home of the Jewish people, and that after October the 7th of 2023 and the horrors of that massacre, that it is important for us to understand that the Jewish people, for the first time ever, have the right to fight back, to stand up for themselves, and for the first time in the last 2,000 years to say that we will never go back to Babi Yar, that we will never go back to Auschwitz, that we will never go back to Dachau and Treblinka, because we Jews and we Zionists in the world, we won't be voiceless victims again. We will stand up for ourselves with reprisals that deter aggression, the way people are now standing up for themselves in the state of Israel. And that's what Zionism means.

00:04:00      Zionism means being an equal people among the nations of the Earth.

**Person:**      The righteous amongst the nations will risk their lives to save Jews from persecution and death.

[End]